**INDIANAPOLIS POWER AND LIGHT COMPANY, et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, et al., Respondents.**

No. 81–1916.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1982.

Decided Sept. 3, 1982.

Rehearing and Rehearing En Banc Denied Nov. 5, 1982.

Fritz R. Kahn, Verner, Liipfert, Bernhard & McPherson, J. Raymond Clark, Washington, D. C., for petitioners.

Craig M. Keats, I.C.C., Washington, D. C., R. Lyle Key, Jr., The Family Lines Rail Systems, Jacksonville, Fla., for respondents.

Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and DAVIES, Senior District Judge.[*]

CUMMINGS, Chief Judge.

This case involves three rate increases that were substantially approved by the Interstate Commerce Commission (ICC). The intrastate application of each of the three increases was blocked, however, by the Public Service Commission of Indiana (state agency). On June 2, 1981, the ICC reaffirmed the increases, holding that the tariffs in question were general increases and that Section 214(b)(6) of the Staggers Rail Act, 49 U.S.C. § 11501(b)(6), ousted the state agency's jurisdiction. I.C.C. Docket No. 38589. On June 10, 1981, Indianapolis Power & Light Company (IPL) petitioned us to review and reverse the ICC's declaratory order. It was joined by intervenors Public Service Company of Indiana (PSI) and the National Association of Regulatory Utility Commissioners (NARUC). Respondent ICC seeks enforcement of its order. The Chessie System Railroads (Baltimore & Ohio, Chesapeake & Ohio, and Chicago, South Shore & South Bend), the Louisville & Nashville Railroad, and the Consolidated Rail Corporation (Conrail) have intervened on the side of the ICC. IPL's requests for a stay of the ICC order pending appeal have been denied both by the ICC and by this Court.

We find that the state agency's efforts to block the increases insofar as they applied to intrastate shipments are precluded by the Staggers Act's reallocation of jurisdiction between state and federal regulatory agencies. Therefore we are affirming the ICC's order permitting the carriers to continue to charge the rates in question.

[*] The Honorable Ronald N. Davies, Senior District Judge for the District of North Dakota, is sitting by designation.

## I. *The History of the Dispute*

On November 1, 1978, the nation's railroads petitioned the ICC for and received authorization to file a master tariff (Ex Parte No. 357) that would have increased their freight rates generally by about 8%. Within the state of Indiana, however, the state agency reduced the increase on intrastate shipments of bituminous coal from 9% to 5%. On July 26, 1979, the railroads likewise sought and received ICC permission to file another 8% increase in national freight rates (Ex Parte No. 368); again the state agency held down the increase on intrastate bituminous coal rates from 15.7% to 13.7%. Both the federal authorizations and the state agency hold-downs occurred before the effective date of the Staggers Act, October 1, 1980.

In early 1981 the eastern railroads sought and obtained ICC permission to file supplements to the 1978 (Ex Parte No. 357) and 1979 (Ex Parte No. 368) tariffs to circumvent the Indiana commission's hold-downs. The theory was that these tariffs as republished would be general rate increases over which the state regulatory agencies had lost jurisdiction, effective October 1, 1980, by virtue of Staggers Act Section 214(b)(6). At about the time the Staggers Act was passed, the railroads sought, and after its effective date the ICC granted, authorization to file yet another national tariff calling for a 5% general rate increase (Ex Parte No. 386), likewise relying on Section 214(b) to insulate this tariff from state agency hold-downs. Undeterred, however, the state agency suspended the Ex Parte No. 386 tariff, insofar as it applied to intrastate bituminous coal shipments (App. F–2) and the supplemental increases in Ex Parte Nos. 357 and 368 (App. F–1). On June 2, 1981, the ICC issued a declaratory opinion holding that the state agency lacked the jurisdiction to take this action. Subsequent to the ICC's decision, the state agency invalidated the three increases (App. J [Ex Parte Nos. 357 and 368]; information supplied at oral argument [Ex Parte No. 386]).

## II. *The Statutory Background*

The Staggers Rail Act, insofar as is relevant to this appeal, effected a basic change in the regulatory spheres of state agencies and the ICC. Congress perceived a great disparity between interstate and intrastate rail rates, caused partly by a lack of uniform standards and partly by state regulatory delay.[1] Its response was twofold: first it took away state jurisdiction over certain aspects of rate regulation, including "general rate increases" (Section 214(b)(6)),[2] and second it set up a federal certification procedure for state agencies (Sections 214(b)(1) and 214(c)) to monitor both the criteria for and the dispatch of decisionmaking in those areas remaining under state regulatory authority. The main bone of contention in this appeal is the meaning and applicability of Section 214(b)(6) of the Act, which provides:

> Notwithstanding any other provision of this subtitle, a State authority may not exercise any jurisdiction over general rate increases under section 10706 of this title * * *.

No one disputes that these increases were under Section 10706.

## III. *The Merits of the Appeal*

In our discussion of the merits of this appeal, we propose to begin by clearing away several pervasive misunderstandings, before attacking the issues relating to the particular tariffs.

---

1. H.R.Rep.No. 96–1035, 96th Cong., 2d Sess. 61, 128-130 (1980), U.S.Code Cong. & Admin. News, p. 3978, discussed at ICC Br. 7–8. The House Commerce Committee estimated that in 1977 the disparity between intrastate and interstate rates cost rail carriers $400 million. *Id.* at 61 (ICC Br. 7).

2. The term "general increase" is not defined in the Staggers Act. The usual meaning accorded to the term by the ICC is "increases by a substantial number of carriers on a substantial number of commodities or services for which the justification is revenue need." *Procedures Governing Rail General Increase Proc.,* 351 I.C.C. 544, 548 (1976). The Staggers Act modifies that definition to the extent that increases must be based on cost, not revenue need alone. ICC Br. at 20.

### A. Preliminary matters

#### 1. Section 706

IPL, PSI, and NARUC submit that Section 706 of the Staggers Act, a savings clause, dictates that pre-Staggers Act law should be applied to any proceedings in which rate proposals were docketed with a rate bureau before October 1, 1980. Accordingly, they argue, the state agency does not lose jurisdiction at once, as Section 214(b)(6) would otherwise seem to indicate, over "general" increases; rather state agency jurisdiction will be phased out gradually as the proceedings come to involve rate proposals docketed with a rate bureau after October 1, 1980. All three of the tariffs in this appeal involve rate bureau docketing before the cut-off date, and hence—the argument runs—the state agency acted properly.

The construction IPL and its intervenors contend for is impossible. Section 706 (codified as a note to 49 U.S.C. § 10706) provides:

> In the case of any proposal docketed with a rate bureau prior to the effective date of this Act which is or becomes the subject of an application or proceeding before the Interstate Commerce Commission, such application or proceeding shall be determined as if this Act had not been enacted, and the antitrust immunity provided in section 10706(b) of title 49, United States Code, resulting from approval of such agreement shall continue in effect.

IPL's construction treats the Section as if it came to a full stop after "enacted," and the language about antitrust immunity did not exist. On the contrary, the long introductory clause is integrally related to the antitrust limitation. As the Court of Appeals for the District of Columbia Circuit stated recently in *National Association of Recycling Industries, Inc. v. Interstate Com-*

*merce Commission and United States of America*, 660 F.2d 795, 799 (C.A.D.C.1981):

> [I]t is a fundamental principle of statutory construction that " 'effect must be given, if possible, to every word, clause and sentence of a statute.' ... so that no part will be inoperative or superfluous, void or insignificant." *In Re Surface Min. Regulation Litigation*, 627 F.2d 1346 (D.C.Cir.1980), quoting from 2A Sutherland, Statutory Construction § 46.6.

IPL's construction cannot be accepted for a variety of reasons. First it is facially implausible. Before the passage of the Staggers Act, rate bureaus enjoyed the broad antitrust immunity under 49 U.S.C. 10706(a)(2)(A). The Staggers Act narrowed that immunity, restricting collective action on general increases to those designed to cover inflationary cost increases. See Section 219, 203 and 206 (49 U.S.C. §§ 10706(a)(3), 10707a and 10712). ICC Br. 9–10. Section 706 bears an obvious relationship to this change: it seems to assure the railroads that any proposal docketed with a rate bureau before October 1, 1980, will not be the basis of new antitrust liability.

Second, IPL's construction, which would apply pre-Staggers Act law to all legal issues—rather than just to antitrust issues in any case where the underlying rate proposal had been before a rate bureau before October 1, 1980—is perilously close to language in the original House bill that Congress explicitly rejected. A proposal that "all applications or proceedings pending before the Commission or other agencies, or any court, shall be determined as if this law had not been enacted" was dropped in favor of Section 706, which in the view of the conferees limited the continued application of the old law to "existing rate bureau proceedings" and left to "controlling case law" the question of which law (pre- or post-Staggers Act) applied in other types of cases.[3] See H. Conference Rep. No. 96–

---

**3.** The conferees' choice of words suggests a construction of Section 706 that it applies only to proceedings that have not advanced beyond the rate bureau stage. If so, Section 706 would have no application, because none of the disputes here involved "existing rate bureau pro-

ceedings." This same understanding appears in dictum in *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 804 n. 12 (8th Cir. 1981), certiorari denied, 454 U.S. 1098, 102 S.Ct. 1253, 71 L.Ed.2d 445. We need not and do not decide this case on that theory.

1430, 96th Cong., 2d Sess. 142 (1980); 1980 U.S.Code Cong. & Admin.News 4174. "Controlling case law" is a shorthand term for the analysis set out in the Supreme Court's opinion in *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476. The applicability of *Bradley* will be discussed in detail in Part III.B *infra*. Here it is enough to note that an agency or court is ordinarily "to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley, supra*, 416 U.S. at 711, 94 S.Ct. at 2016.

Third, IPL's construction has the effect of exalting the savings clause over the plain language of the more specific provision in Section 214(b)(6) that "*notwithstanding any other provision of this subtitle*, a State authority may not exercise any jurisdiction over general rate increases * * *" (emphasis supplied). If there were a conflict between the two Sections, Section 214(b)(6)'s specific language would supersede Section 706, which is a general provision. *Busic v. United States*, 446 U.S. 398, 406, 100 S.Ct. 1747, 1753, 64 L.Ed.2d 381.

Fourth, IPL's construction is at odds with the interpretation the ICC itself has adopted. IPL seeks to avoid the usual rule that a court defers to the reasonable interpretation of the agency charged with administering a statute, *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 35–37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), by pointing out that the ICC has changed its interpretation: in an earlier phase of Ex Parte No. 386, the ICC had adopted a position like the one urged by IPL. App. A at 4, 5. We know of

no authority to support IPL's (implicit) assertion that a change of mind opens the way for us to substitute our judgment for the administrative agency's; even if such authority existed, we would not here intervene where the ICC's considered position is consistent with both the statutory language and the legislative intent.[4]

### 2. Certification

IPL and the intervenors on its side next contend that the ICC's provisional certification of 40 state regulatory programs, including Indiana's, in Ex Parte No. 388 (46 Fed.Reg. 23,335 (April 24, 1981)) allowed the state agency to regulate intrastate applications of rail rates, even if they were contained in a general increase. This argument misapprehends the place of the certification requirement in the Staggers Act scheme: certification does not create state jurisdiction in areas where the statute removes it, but simply insures that in the remaining areas a state will either follow the federal guidelines, be ousted by federal regulation, or opt for total deregulation. See the later ICC clarification of Ex Parte No. 388 (dated January 25, 1982, and submitted to us by PSI after the oral argument herein), especially pp. 2–3 and 5. It is noteworthy that Indiana is among the states there criticized because its certification submissions "do not even acknowledge that the States have lost jurisdiction over general rate increases, inflation-based rate increases, and fuel adjustment surcharges." *Id.* at 5.

### B. The Tariffs Themselves

From the multiplicity of arguments presented in the various briefs, two main

4. IPL makes a subsidiary argument about the ICC's change of heart (Reply Br. 4–5). In the phase of Ex Parte No. 386 where it applied pre-Staggers Act law, the ICC allowed the 5% increase based on revenue need, although it said only 4% was cost-justified. Cf. note 2 *supra*. In its June 2, 1981, decision now under review the ICC applied the Staggers Act without explicitly addressing the necessity for cost-justification of rate increases. IPL Br., App. A. There are two answers to IPL's points: First, in another phase of Ex Parte No. 386, reprinted as App. F to the ICC Brief, the ICC, having rescinded its earlier snap interpretation of Section 706, also reconsidered the increase and found it fully warranted under the Staggers Act criteria. Second, whether the increase should be 4% or 5% is irrelevant to the jurisdictional questions in this appeal. At most, the ICC may have erred in approving the full increase in Ex Parte No. 386; the state agency nonetheless lacked jurisdiction to hold down the increase on intrastate coal shipments.

issues emerge, each of which must be considered separately, first with respect to Ex Parte No. 386, then with respect to Ex Parte Nos. 357 and 368. (1) Are the tariffs general increases, for which the Staggers Act prescribes uniform federal regulation, or specific increases which the states may continue to regulate subject to federal guidelines? (2) If the tariffs are general increases, subject to federal regulation, is there anything in either the procedure or the substance of the ICC decisions that makes the regulation retroactive in violation of *Bradley v. Richmond School Board, supra*, or procedurally unfair?

### 1. *Ex Parte No. 386*

 Ex Parte No. 386, which involved a 5% across-the-board increase, is clearly a general increase under Section 214(b)(6), as even IPL and its intervenors concede (see, *e.g.*, IPL Reply Br. 9–10; PSI Reply Br. 7, 24). We have learned from the ICC's docket department that permission to file Ex Parte No. 386 was sought on September 30, 1980, just before the Staggers Act became effective.[5] Therefore, although Section 706 does not help IPL (Part III.A.1 *supra*) and the certification is irrelevant (Part III.A.2 *supra*), there is at least a potential *Bradley* problem in the application of the Staggers Act to a proceeding pending before the effective date of that legislation.

 The problem, however, is not serious and does not justify a departure from the general rule that the decisionmaker (here the ICC) should apply the law in effect at the time its decision is made. *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796 (8th Cir. 1981), certiorari denied 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445, on which both PSI and NARUC rely, is more instructive for its differences than for its similarities. That case involved the applicability of the Staggers Act to contract rates for the transportation of coal that had been agreed on in 1973 and that the railroad had tried to raise unilaterally. Litigation in the ICC and the appellate courts had been going on for three years, and the ICC finally upheld the lower contract rates under pre-Staggers Act law, on October 1, 1980. The Burlington Northern contended that the ICC should have applied the Staggers Act and that, had it done so, it would have had no jurisdiction to consider the case, because the new threshold requirement of market dominance by the carrier could not be satisfied. In applying the criteria of *Bradley* to these circumstances, the Eighth Circuit found that the private status of the litigants militated against retroactivity while the national concern for the deterioration of railroads militated for it. The decisive factor therefore was the interest of the power company in the decision it had, after hard struggles, secured. On Burlington Northern's view, ICC jurisdiction could have been lost altogether and the power company forced to begin all over again in the courts.[6]

Here by contrast IPL, PSI, and other potential objectors to Ex Parte No. 386 had no such vested interest to tip the balance.

---

5. Resort to the ICC was necessitated by ambiguity in the briefs. The Staggers Act was passed on October 1, 1980, signed into law on October 14, 1980, and became effective as of its passage. The ICC (Br. at 11) says Ex Parte No. 386 was "initiated approximately when the Staggers Act was passed." PSI (Br. 33, n. 26) says that Ex Parte No. 386 was filed with the ICC before the effective date of the Staggers Act but processed after that date. IPL (Reply Br. 9) "concede[s] that [Ex Parte No. 386] was filed with the Commission after the effective date of the Staggers Act and that the retroactivity arguments advanced with respect to the [Ex Parte Nos. 357 and 368] tariff filings are not applicable." For the sake of a full exposition of the argument, we ignore IPL's concession.

6. *Cleveland-Cliffs Iron Co. v. ICC*, 664 F.2d 568, 589–591 (6th Cir. 1981) follows the *Iowa Power Company* Court's analysis, and reaches an identical result, in a case that likewise involved contract rates which the ICC enforced in a decision made in December 1979 and explained in March 1980. Although both the Eighth and the Sixth Circuits have concluded that retroactive application of the Staggers Act in the circumstances presented would violate *Bradley*, we create no conflict with those decisions in finding that in the quite different circumstances presented here no *Bradley* problems exist. Note, too, that neither case rested on Section 706, nor did either court interpret that provision differently from the ICC's current, correct interpretation.

The proceedings before the ICC were at a very preliminary stage on October 1, 1980; the ICC did not grant permission to file the tariff until December 6, 1980; it was in fact filed on December 28 and approved on December 31, 1980. The tariff was published with appropriate notice, and IPL, PSI, or other interested parties had ample opportunity to appear before the ICC and seek suspension and investigation of the tariff under 49 U.S.C. 10707 (formerly Section 15(8) of the Interstate Commerce Act). They did not use this option because they believed—erroneously as it turns out—that the state agency could give them the relief they sought. Even now they are not without recourse: they can file a state agency complaint about a particular intrastate coal rate in Indiana (indeed PSI has done so; see Chessie System and L&N Br., App. A). ICC Br. at 34; Chessie System and L&N Br. at 10; Conrail Br. at 25; IPL Reply Br. at 11. Admittedly the burden will be higher (IPL Reply Br. at 11), and admittedly the carrier can then take an immediate appeal to the ICC, which will evaluate the state agency's decision for its consistency with federal guidelines (Staggers Act Section 214(c), 49 U.S.C. § 11501(c)). Objections can also be registered directly with the ICC under either 49 U.S.C. § 11701 or § 10704 (formerly Sections 13(1) and 15(1) of the Interstate Commerce Act), although there the attack must be on the whole interstate tariff, and the burden of proof will be higher because the tariffs have already been approved. Nonetheless, we regard the comparative disadvantage under which IPL, PSI, and other potential objectors now find themselves to be a consequence of their own wrong guess and not the result of basic procedural inadequacies or flawed retroactive application of the Staggers Act itself.

### 2. *Ex Parte Nos. 357 and 368*

■ There are two salient differences between these tariffs and Ex Parte No. 386. First they were not across-the-board increases: they dealt only with rates for intrastate shipments of bituminous coal in Indiana, and were designed to bring the coal rates into line with the general rates which the ICC had approved in 1978 and 1979. IPL and its intervenors argue that these could only be specific increases over which the state had not lost jurisdiction. The ICC and the intervening railroads argue that because the supplemental filings were simply efforts to reinstate the full general increase, they are general as well. In essence the ICC's position is that only the state agency hold-down has given these filings their apparent specificity. Neither side has supplied us with more than assertion to support its position, and we are mindful that adopting either position may have broad consequences. If the increases are treated as general, then a host of pre-Staggers Act state agency hold-downs can be circumvented by the expedient of refiling the held-down portion of the tariff, with appropriate notice, before the ICC. On the other hand, if the increases are treated as specific, the states' ability to perpetuate pre-Staggers Act hold-downs may be unimpaired, and the disparity between interstate and intrastate rail rates, which moved Congress to enact the Staggers Act in the first place (see note 1 *supra*), will not be alleviated. On balance the ICC's position is more consonant with the Congressional intention in enacting the Staggers Act. We nonetheless limit our holding to the facts of this particular case: where the republished tariffs had been part of general increases approved by the ICC and they were subsequently blocked by the state agency, efforts to round out or implement the approved general increase can themselves be considered general.

The second major difference is that the tariffs in Ex Parte Nos. 357 and 368 were presented by a December 31, 1980 petition, well after the effective date of the Staggers Act, although they had the practical effect of overriding the state agency's otherwise final, pre-Staggers Act decision. Technically, therefore, these were new proceedings, begun and concluded under the Staggers Act and creating no retroactivity problems. The ICC emphasizes the timing aspect: there is nothing unusual, it says, in republishing a hitherto disapproved tariff, and the state agency had conclusively lost jurisdiction under Section 214(b)(6) before

these tariffs were refiled. Br. at 17. IPL, of course, emphasizes the practical result: the refilings, it argues, amount to a collateral attack on otherwise unassailable state agency decisions and therefore violate the spirit, if not the letter, of *Bradley*. Br. at 17–19. What IPL's argument overlooks is that Congress—and not the ICC or the railroads—wrought the fundamental change that made the practical result in Ex Parte Nos. 357 and 368 possible and that it lay well within Congress' power to do so. These tariffs are not being raised retroactively and hence the state agency's initial hold-down decisions are not undone—they are simply superseded. The ICC's action allows uniform national rates to be charged prospectively, now that Congress has established that the states should no longer be able to further their own interests at the expense of the nation's.

As was the case with Ex Parte No. 386, the IPL and any other parties that had objections to the supplemental filings could have appeared before the ICC to voice them. IPL had in fact appeared when the ICC was originally considering the across-the-board increase in Ex Parte 368, before the Staggers Act was enacted; and PSI appeared to contest the ICC's post-Staggers Act permission to file supplemental tariffs in Ex Parte Nos. 357 and 368. See ICC Br. 34 n. 17 (re IPL) and 33 (re PSI). That the objectors did not play a more vigorous role in the ICC proceedings is again the result of their erroneous conviction that the state agency retained jurisdiction. As was the case with Ex Parte No. 386, this mistaken conviction has cost them the opportunity to have the ICC suspend and investigate the supplemental tariffs, but does not preclude all challenge either to a particular rate in Indiana or to the general tariff before the ICC.

### IV. *Conclusion*

When all is said and done, IPL, PSI, and NARUC are basically challenging the wisdom of the new national railroad regulatory policy embodied in the Staggers Act. They prefer the earlier statutory scheme which vested more power in state agencies. They seek to preserve that scheme, in the face of Congressional dismantling of it, by arguing that the statute does not mean what it says or that its application to them is unfairly retroactive. Finding these arguments unpersuasive, we approve the Interstate Commerce Commission's order of June 2, 1981. The railroads may continue to charge the rates embodied in Ex Parte Nos. 357, 368, and 386, on bituminous coal shipments within Indiana, unless and until successful objection is made to them under the procedures outlined above. The state agency lacks jurisdiction to suspend and invalidate these increases by virtue of Staggers Act Section 214(b)(6).[7]

Affirmed.

PELL, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority opinion with the exception of the disposition as to Ex parte Nos. 357 and 368 as to which I respectfully dissent.

The petition to the ICC to amend tariffs 357 and 368 were expressly for the "purpose of making increases in rates and charges fully applicable on Indiana Intrastate Traffic when in connection with Bituminous Coal rates and charges." The railroad's application specifically stated that the increases were being proposed because "the Indiana State Commission has held-down the increases authorized by the ICC from 9% to 5% under X357A and from 15.7% to 13.7% under X368A on bituminous coal traffic." Indeed, the majority opinion expressly rec-

---

**7.** The rule that a reviewing court must judge the propriety of a determination by an agency, which it alone is authorized to make, by the grounds the agency invokes (*SEC v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995) precludes our consideration of the argument (see, *e.g.*, Conrail Br. 30–33) that even if the state agency had jurisdiction over these

three tariffs, it lost it by failing to act on them within the 120-day period prescribed by Section 11501(b)(1)(B) of the 1978 Interstate Commerce Act (now codified at 49 U.S.C. § 11501(d)(1)(B)). We have also considered the other arguments raised by the parties, but do not deem them worth discussion herein.

ognizes that the tariff published in the supplements "dealt only with rates for intrastate shipments of bituminous coal in Indiana."

The ICC in the decision under review determines the rate increases published in the supplements to be general rate increases within the meaning of Section 214 of the Staggers Act. In doing so, the Commission ignores the generally accepted definition of the statutory phrase "general rate increases." I can see no basis for the language contained in the railroad's application qualifying as a request to promulgate "general rate increases." General rate increases are those which apply nationally or throughout broad regions of the country, affecting all commodities or large numbers of them. The distinction between general rate increase cases, or general revenue proceedings, and agency actions affecting individual rate adjustments is one that is well established, understood by the industry and heretofore urged upon the courts by the Commission, in terms altogether at odds with the position it now takes.

In *Florida Citrus Commission v. United States*, 144 F.Supp. 517 (N.D.Fla.1956), aff'd mem., 352 U.S. 1021, 77 S.Ct. 589, 1 L.Ed.2d 595 (1957), the Commission argued for dismissal of the petition for review, maintaining that its decision was entered in a general revenue proceeding and did not connote its approval of a particular rate filing. The court agreed:

> [T]he Commission has exercised jurisdiction in a number of proceedings which have been commonly called "general revenue" cases, where revision has been sought as to ... all traffic or on particular commodities or groups of commodities, either nationwide or in a large territory, in contradistinction to the 'rate' cases, so called, in which the reasonableness of specific rates has been determined.

144 F.Supp. at 521.

Similarly, the Commission successfully persuaded the court to dismiss the petition for review of its decision authorizing a general rate increase in *Atlantic City Electric*

*Co. v. United States*, 306 F.Supp. 338, 341 (S.D.N.Y.1969), where the court noted:

> [T]he proceeding before the Commission was a general revenue proceeding. The Commission was concerned primarily with the "need, in the public interest, of adequate and efficient railway transportation service" and with the railroads' "need of revenues sufficient to enable the carriers, under honest, economical, and efficient management to provide such service." 49 U.S.C. § 15a(2). The increases in rates were general, even though the percentage of increase varied from commodity to commodity.

See also *Aberdeen & Rockfish Railroad Co. v. S.C.R.A.P.*, 422 U.S. 289, 313, 95 S.Ct. 2336, 2352, 45 L.Ed.2d 191 (1975), in which the Supreme Court said:

> Proceedings ... in which the ICC has been called upon to decide whether to prevent a substantially across-the-board rate increase, have become known as general revenue proceedings. The ICC's inquiry has tended to focus on whether the railroads are really in need of increased revenues and has tended to leave for individual rate or refund proceedings under 49 U.S.C. §§ 13 and 15 the problem of determining just which commodities on which runs should bear the increased burden, and to what extent.

The cited cases demonstrate that the tariff filings increasing the railroad rates on bituminous coal traffic moving intrastate in Indiana simply cannot be labeled "general rate increases" as the Commission sought to do in its decision. By their own terms, the tariff supplements relate "only to a single commodity" and do not provide for, in the language of the Supreme Court's opinion, "a substantially across-the-board rate increase." They provide for very specific and limited rate adjustments and do not affect the railroads' rate structure generally.

Aside from this erroneous interpretation of statutory terms, it appears to me that with regard to 357 and 368, the ICC was in effect applying retroactively the standards of the Staggers Act which became effective subsequent to final action of the Public

Service Commission of Indiana (PSCI), the proceedings of which were not challenged by the railroads before the PSCI. As I have indicated above, there is no disagreement that the railroads published the tariff supplements simply to put into effect previous general rate increases but this was only to the extent that they had been disallowed by the 1979 and 1980 orders of the PSCI. These rulings of the PSCI hearing were final, complete, and legal as of the time they were issued. The Commission, by approving the post-Staggers petitions of the railroads, judged the final decisions of the PSCI by the new standards of the Staggers Act. The ICC ruling in effect retroactively rescinded decisions which the ICC had no power to do at the time the decisions were entered.

As the Supreme Court said in *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964), quoting from *Union Pacific Railroad Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913):

> "the first rule of construction is that legislation must be considered as addressed to the future, not to the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'" [Footnote omitted.]

*Accord, United States v. Estate of Donnelly*, 397 U.S. 286, 90 S.Ct. 1033, 25 L.Ed.2d 312 (1970); *Taliaferro v. Stafseth*, 455 F.2d 207, 209 (6th Cir. 1972); *Farmington River Power Co. v. FPC*, 455 F.2d 86, 90 (2d Cir. 1972). The error of the Commission in applying the standards of the Staggers Act retroactively is particularly manifest because the railroads had an adequate remedy against the decisions of the PSCI at that body had they felt themselves sufficiently aggrieved.

The increases published in the tariff supplements are not new, prospective applications. Rather, the railroads have filed supplements to existing tariffs that, in the two instances, were the subject of prior proceedings and adverse rulings by the PSCI. It would seem, absent an explicit declaration of purpose, Congress could not have intended to oust state commissions of jurisdiction to decide matters intimately related to prior rulings simply by permitting the railroads to denominate a subsequent charge a "general increase," particularly when it was not. The railroads' actions here, in filing supplements to tariffs heretofore declared to be unlawful, are a collateral attack upon the prior lawful rulings of a state agency, and the Commission's decision condoning such actions and approving such increases is an unconscionable abuse of agency discretion.

The majority opinion recognizes that "[i]f the increases are treated as general, then a host of pre-Staggers Act state agency holddowns can be circumvented by the expedient of refiling the held-down portion of the tariff, with appropriate notice, before the ICC." I have no way of knowing how much other intrastate tariff situations may be identical with those involved in the present case which are the only ones with which we are dealing but at least the circumvention by the expedient of refiling after the effective date of the Staggers Act is exactly what happened here.