**KENTUCKY UTILITIES CO., et al.,
Petitioners-Appellants,**

v.

**INTERSTATE COMMERCE COMMISSION, et al., Respondents-Appellees.**

**Nos. 82–3312, 82–3379.**

United States Court of Appeals,
Sixth Circuit.

Argued May 4, 1983.

Decided Nov. 10, 1983.

Rehearing and Rehearing En Banc Denied
Feb. 24 and April 4, 1984.

C. Michael Loftus argued, John H. Le-Seur, Kelvin J. Dowd, Slover & Loftus, Washington, D.C., Malcolm Y. Marshall, Stephen E. Embry, Ogden, Robertson & Marshall, Louisville, Ky., Chat Chancellor, Frankfort, Ky., for petitioners-appellants.

Richard A. Allen, Lawrence Richmond, John J. McCarthy, Jr. argued, I.C.C., John J. Powers, III, Kenneth P. Kolson, Dept. of Justice, Washington, D.C., for respondents-appellees.

John D. Luken, Dinsmore & Shohl, Cincinnati, Ohio, Fred R. Birkholz, Jacksonville, Fla., for intervenor Louisville and Nashville R. Co.

Michael F. McBride, Le Boeuf, Lamb, Leiby & MacRae, Washington, D.C., for intervenor-petitioner Edison Elec. Institute.

Philip J. Davis, Kirkland & Ellis, Washington, D.C., for intervenor-petitioner CF Industries, Inc.

Stephen Ailes, Betty Jo Christian, Samuel M. Sipe, Jr., Steven A. Brigance, Steptoe & Johnson Chartered, Washington, D.C., for intervenor The Ass'n of American Railroads.

Paul Rodgers, Charles D. Gray, Washington, D.C., for intervenor Nat. Ass'n of Regulatory Utility Comm.

Before MERRITT and KRUPANSKY, Circuit Judges, and TAYLOR, District Judge.*

* Hon. Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation.

KRUPANSKY, Circuit Judge.

These consolidated petitions by Kentucky Utilities Co. (KU) and the Kentucky Railroad Commission (KRC) seek a review of a decision of the Interstate Commerce Commission (ICC) which set aside an Order by the KRC as to the maximum rate allowable for intrastate coal shipments by the Louisville & Nashville Railroad (L & N). At issue is a comparatively recent section of the Interstate Commerce Act, known as the Staggers Act, 49 U.S.C. § 11501(c), which permits the ICC to set aside a state rate-making decision effecting intrastate rail traffic if the state regulatory body employed a rate formula "not in accordance with" the standards applicable to setting interstate rates utilized by the ICC.

The instant case, deemed to be a matter of first impression by the parties, has generated eleven briefs, with six of those briefs attributable to intervenors or *amici* with an interest in national railroad ratemaking. *E.g.* Louisville and Nashville Railroad Co. (L & N), Association of American Railroads, CF Industries, Edison Electric Institute (the trade group for investor-owned electric utilities), and the National Association of Regulatory Utility Commissions (NARUC) (the national organization composed of members of state regulatory bodies). Moreover, the bound record on appeal encompasses three volumes and 2252 pages. Despite this complexity, the facts are essentially not disputed and the contested issues present relatively straightforward questions of law. Because these facts unfold against the backdrop of national rail regulatory policy, that historical framework is prologue to articulating the particular events of the present controversy.

Prior to amending the Interstate Commerce Act in 1980, state agencies exercised primary, though not exclusive, jurisdiction over rail rates for intrastate shipments. The ICC could pre-empt state authority and fix an intrastate tariff·in only two situations: (1) when the state intrastate rate "unjustly discriminated against or imposed an undue burden upon" interstate commerce; or (2) when the state was dilatory in acting upon a proposed rate change. *See* 49 U.S.C. § 11501 (repealed). This federal/state responsibility was found by Congress to have produced a situation where state commissions, responding to pressure from local shippers, maintained intrastate rates unreasonably low, thereby compelling railroads to exact disproportionately higher revenues from interstate service to compensate for losses incurred on intrastate routes. Congress determined that this $400 million annual revenue disparity had two basic causes: (1) wide discrepancies in ratemaking standards and procedures of the states; and (2) excessive regulatory delay between the filing of a proposed rate and the final disposition. *See* H.R.Rep. No. 96–1035, 96th Cong., 2d Sess. (1980), U.S.Code Cong. & Adm.News, p. 3978. *See also Indianapolis Power and Light Co. v. I.C.C.*, 687 F.2d 1098 (7th Cir.1982).

■ To correct the inequality of treatment accorded to railroads, and to provide for "adequate revenues", 49 U.S.C. § 10101(a)(3), Congress eliminated *all* state authority over "general rate increases" (*id.* at § 10706), rate increases resulting from fuel surcharges (*id.* at § 10705a), and "inflation-based rate increases" (*id.* at § 10712). In the remaining rate-making areas, Congress mandated that state agencies conform to federal standards and procedures by: (1) requiring state regulatory commissions to obtain certification from the ICC that the state is implementing standards and procedures which are "in accordance with" the ICC's own practice (*id.* at § 11501(b)(3)(A)); (2) providing that any rail carrier aggrieved by state action "may petition the [ICC] to review the decision of any State authority * * * on the grounds that the standards and procedures employed by the State were not in accordance with the provisions of this subtitle" (*id.* at § 11501(c)); and (3) vesting the ICC with "exclusive authority" to fix rates if the state has not acted within 120 days on a rate change which would conform intrastate tariffs to interstate tariffs. *Id.* at § 11501(d). The dispute here at bar arises under the restriction of state authority con-

tained in the review provision § 11501(c)-(e) which provides:

(c) Any rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate, classification, rule, or practice is determined, on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle. The Commission shall take final action on any such petition within 30 days after the date it is received. If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice.

(d)(1) The Commission has exclusive authority to prescribe an intrastate rate for transportation provided by a rail carrier subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title when—

(A) a rail carrier files with an appropriate State authority a change in an intrastate rate, or a change in classification, rule, or practice that has the effect of changing an intrastate rate, that adjusts the rate to the rate charged on similar traffic moving in interstate or foreign commerce; and

(B) the State authority does not act finally on the change by the 120th day after it was filed.

(2) When a rail carrier files an application with the Commission under this subsection, the Commission shall prescribe the intrastate rate under the standards of subsection (a) of this section and chapter 107 of this title. Notice of the application shall be served on the State authority.

(e) The Commission may take action under this section only after a full hearing. Action of the Commission under this section supersedes State law or action taken under State law in conflict with the action of the Commission.

49 U.S.C. § 11501(c)-(e).

KU obtains coal for its Ghent, Kentucky electric generating plant from the Hazard Coal Field in Kentucky via, in substantial part, rail facilities of the L & N, which is the only rail carrier servicing Hazard. In March 1981, approximately six months subsequent to the effective date of the Staggers Act, KU filed a complaint with the KRC charging that L & N's rate was excessive and that the KRC had jurisdiction under the test promulgated by the Staggers Act. The KRC, indeed all parties, agreed that federal standards were controlling. Accordingly, the KRC consulted an ICC proposed "Coal Rate Guideline", *Ex Parte No. 347,* issued November 18, 1980, which required that maximum reasonable rates be established by a "ton/ton mile" formulation; a calculation which allocates fixed costs of the railroad in proportion to the tonnage hauled by a particular service[1]. This standard had been devised by the ICC as a more exact formula for distributing a railroad's fixed cost among individual shippers subsequent to judicial repudiation of the previous ICC methodology, which simply provided for a fixed percentage add-on to the variable cost of each specific service. *San Antonio, Texas v. United States,* 631 F.2d 831 (5th Cir.1980).

The KRC unequivocally adhered to the ICC recommendation of ton/ton-mile formula as "the appropriate measure of rate reasonableness" and therefore the only option available to a state agency under the Staggers Act. The KRC also utilized the most current cost data available (1979) and promulgated rates of $5.11/ton for coal moved in cars furnished by the shipper and $6.00/ton in L & N's cars. The net effect of the KRC ruling was to give L & N all

---

**1.** Rail "service" refers to the utilization of particular routes, equipment and schedules by the carrier to serve specific shippers or locations.

but $.20/ton of its requested rate and to exceed by $.50/ton the rate proposed by KU.

Within a month of the KRC decision, the ICC issued *new* rate guidelines which retreated from a "uniform acceptance" of the ton/ton-mile formula in favor of "case-by-case adjudication." *Ex parte No. 347 (Sub-No. 1),* December 21, 1981 at 1, 4. It is critical to note that the ICC neither totally "rejected" ton/ton-mile as the Commission here argues, nor did it make ton/ton-mile "a discretionary, not mandatory, standard", as contended by petitioners; rather, the ICC clearly rejected ton/ton-mile as a *"cost formula",* *id.* at 8, while leaving open as a possibility the incorporation of ton/ton-mile *data* into a yet unspecific future rate-fixing formula. *Id.* at 4, 8. On the basis of the newly adopted ambiguous policy position of the ICC, the L & N exercised its statutory right to seek review of a state decision by the ICC.

In its order, presently before this Court on appeal, the ICC acknowledged that the KRC "precisely followed the federal standards applicable at that time" and further acknowledged that "KRC's reliance on the rejected standard is not necessarily inconsistent with the Act." However, the ICC found that, because the KRC utilized a formula, its order "neither discusse[d] nor reflect[ed] *how* these rate prescriptions will assist the L & N to achieve revenue adequacy", and further found that because the rates set by the KRC were "only 8 percentage points above" the level at which the ICC could exert jurisdiction over a rate case, the KRC order was set aside. Having nullified the state decision, the ICC was mandated by the statute to "authorize * * the appropriate rate." 49 U.S.C. § 11501(c). In a single, twelve-line paragraph, the ICC noted that the L & N was a "revenue inadequate" carrier and the railroad's own proposal "should not be considered excessive." The carrier's rates were thereupon approved.

KU petitioned for a stay of the ICC order, charging that the Commission's decision was arbitrary in rejecting a logical state application of a reasonable rate formula under circumstances where no substitute rate-fixing guidelines existed. The ICC denied the stay and asserted that the Act required it to establish a rate for the L & N within 30 days and not to "address the question of which standards govern over maximum reasonableness." The instant appeal ensued.

The two related issues joined on review are whether the ICC violated applicable administrative standards when it (1) overruled the KRC ratemaking order, and (2) approved L & N's proposed rate as the "authorized" tariff.

As reflected in the composition of the issues, the ICC's decision incorporated two separate elements. First, the Commission set aside the order of the state agency as founded upon an impermissible, "rejected" standard, *i.e.,* the ton/ton-mile formula. Second, the ICC pronounced that the "authorized rate" was L & N's own proposal. These distinct conclusions will be considered individually subsequent to addressing the standard of review to be applied by this court in considering the agency's action.

This Court defined the applicable standard of review in the recent case of *Cleveland-Cliffs Iron Co. v. ICC,* 664 F.2d 568 (6th Cir.1981):

> We note at the outset that courts traditionally have applied deferential standards in reviewing rate determinations by an agency that possesses expertise to analyze complicated economic data. *Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). Nevertheless, the courts retain authority to review agency decisions and to determine whether those decisions comport with applicable law, whether they are supported by the evidence, and whether the rationale employed is both discernible and defensible. *San Antonio, Texas v. United States,* 631 F.2d 831, 836 (D.C.Cir.1980).

664 F.2d at 580. *Accord, American Trucking Association, Inc. v. United States,* 642 F.2d 916, 910 (5th Cir.1981); *Pre-Fab Tran-*

*sit Co. v. United States,* 595 F.2d 384 (7th Cir.1979).

As noted, *Cleveland-Cliffs* emphasized that an agency action must be explained with a rationale that is "both discernible and defensible." *Supra.* This rubric of judicial review was amplified by the Supreme Court in *Atchison, T. & S. F. Ry. Co. v. Witchita Bd. of Trade, supra,* a case explicitly relied upon in *Cleveland-Cliffs,* as follows:

> A reviewing court must be able to discern in the Commission's actions the policy it is now pursuing, so that it may complete the task of judicial review—in this regard, to determine whether the Commission's policies are consistent with its mandate from Congress. Since we cannot tell from the Commission's opinions what those policies are, we therefore agree with the District Court that the Commission's order finding the rates just and reasonable cannot be sustained.

412 U.S. 800, 805–806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350.

▪ As an additional standard of review KU specifically argues that intrastate transportation is primarily the concern of the state and thus ICC orders must meet "a high standard of certainty" to remain valid. *North Carolina v. United States,* 325 U.S. 507, 511, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945). Whatever merit the "high standard of certainty" test enjoyed in 1945, it is simply incorrect to apply that measure of review, and its underlying assumptions, to the regulatory framework created by the Staggers Act in 1980. As the Seventh Circuit stated in *Indianapolis Power & Light Co. v. ICC, supra,* 687 F.2d at 1100, the Staggers Act "effected a basic change in the regulatory spheres of state agencies and the ICC" such that, in the words of the statute itself, 49 U.S.C. § 11501(b)(1), a state may regulate intrastate transportation *"only* [if done] * * * *exclusively* in accordance with the provisions of this subtitle." (Emphasis added). This supplemental standard of review advanced by KU is without merit.

▪ In sum, the basis for review is the test promulgated by this Court in *Cleveland-Cliffs, supra,* with particular attention to the requirement that ICC decisions be founded upon an expressed rationale which is "both discernible and defensible."

The essence of the ICC order which invalidated the KRC decision was that the ton/ton-mile formula relied upon by the state was not the appropriate ratemaking standard in effect at the time the ICC reviewed the case. KU and the KRC initially responded that the state decision was supportable under existing ICC rate formulations and further contended that reference by the ICC to jurisdictional revenue limits for the purpose of ascertaining revenue reasonableness was improper. The Court, however, must initially determine if the ICC, under the Staggers Act, had any basis for reviewing the KRC order. Simply put, the Commission could not hold that the KRC did not apply the correct ratemaking standard unless the ICC itself already promulgated a legitimate, discernible standard in the first instance.

▪ The Staggers Act contemplates that states will adopt specific "standards and procedures" for establishing rail rates and will present those standards to the ICC for "certification". § 11501(b)(2), (3). If the standards are unacceptable, the ICC "shall" deny certification and the state "may not exercise any jurisdiction over intrastate rates" until it receives certification. § 11501(b)(4)(A). In such cases, the ICC retains exclusive jurisdiction over intrastate rail regulation. § 11501(b)(4)(B). If however, the standards submitted by the state are certified, the state may apply those standards for five years, subject to Commission review. § 11501(b)(5)(A), (c). Within the five-year period of certification, a state may not "change its certified standards and procedures without notifying and receiving express approval from the Commission." § 11501(b)(5)(B). Clearly, the linchpin of the statutory scheme is a specific ICC ratemaking standard which will serve as the basis for certifying or disallowing the state standards. Where the standards and proce-

dures submitted by the various states conform to the Commission's benchmark standard, the state standards are to be certified; where the state proposal does not conform, the ICC's original standard will be directly applied in intrastate tariff cases by the Commission itself through the exercise of its exclusive jurisdiction.

■ This reliance within the structure of the Staggers Act upon a primary polestar standard at the ICC is most critical in the statute's review provision. The Commission is authorized to examine rates established pursuant to certified state standards only to determine if the previously certified standards were correctly applied. § 11501(c). In the event that the Commission initially failed to formulate its own benchmark standard, no meaningful state certification could occur and any review of state decisions by the ICC would be no more than *ad hoc* ratemaking. The record in the matter at bar forcefully discloses that the Commission has defaulted on its central obligation to define a primary ratemaking standard and has thereby vitiated operation of the Staggers Act. By circulating to the states a succession of "interim" ratemaking "guidelines" in lieu of a single clear standard, and by certifying state procedures which simply obligate the state to apply any new rate theory currently in vogue at the ICC, the Commission has made even certified state proceedings contingent upon the fickle methodology of the ICC, and has recreated the ICC review procedure as a *de novo* rate hearing not subject to previously articulated standards. This Court is constrained to conclude that the Commission's default of its statutory duty to certify state ratemaking *standards* has invoked operation of § 11501(b)(3)(B) which provides:

(B) The standards and procedures existing in each State on the effective date of the Staggers Rail Act of 1980 for the exercise of jurisdiction over intrastate rail rates, classifications, rules, and practices shall be deemed to be certified by the Commission from that date until the date an initial determination is made by the Commission under subparagraph (A) of this paragraph.

■ Accordingly, inasmuch as no valid initial certification has been accomplished, the standards and procedures of the KRC "shall be deemed to be certified by the Commission." *Id.* Thus, the ICC had no warrant to consider its own "interim guidelines" as the controlling, certified standard. It should not be understood by this holding, however, that the KRC decision is totally beyond review by the ICC. Properly understood, the Court here merely finds that the ICC's dereliction of its initial responsibility under the Staggers Act to formulate a polestar ratemaking standard for use in certified state standards has established the standards employed by the KRC as the applicable rate formula herein, limiting the scope of the Commission's inquiry to the issue of whether the Kentucky standards were applied "in accordance with the provisions of this subtitle." § 11501(c).

■ The sole basis offered by the ICC for overturning the KRC order as not in accord with the Staggers Act is the observation that the state standard would provide L & N with revenues only 43% above recovery of their fixed costs. The Commission stated that such a rate was "only 8 percentage points above the present jurisdictional threshold [of 65% over fixed costs, expressed as a revenue-to-cost ratio of 165%]." The Commission implied that such a relationship between the Kentucky rate and the statutory "threshold" was evidence that the state tariff was unreasonably low and could not promote the Staggers Act goal of "revenue adequacy" for railroads. In fact, the statute establishes a jurisdictional limit, not a test for reasonableness. Railroads which earn less than 65% above recovery of their fixed costs (165%) on a given route are presumed, by law, not to possess "market dominance" and the ICC has no jurisdiction over their rate structure. 49 U.S.C. § 10709(d)(2). In other words, this limit deregulates railroads in competitive markets and reserves the regulatory mechanism for services where, by virtue of amount of revenue generated above cost, it is likely

that a carrier has market dominance and is setting prices outside of a competitive situation. It is critical to note that while rail lines generating below 165% of fixed costs are beyond review, Congress specifically provided that a percentage "equal to or greater than" 165% (1) does not decide the issue of whether dominance actually exists—it merely vests jurisdiction with the ICC to conduct the inquiry; or (2) *"does not establish a presumption that \* \* \* the proposed rate exceeds or does not exceed a reasonable maximum."* *Id.* at 10709(d)(4) (emphasis added).

In sum, the ICC may properly set aside the KRC decision only if the state tariff, which is based upon a certified standard, produces a rate or procedure not in accord with the Act. Here, the ICC's decision to void the KRC rate because it afforded the L & N revenues only 8 percent above the Commission's jurisdictional limit is a legally erroneous basis for a decision involving rate reasonableness.

Subsequent to invalidating the KRC tariff, the ICC authorized the L & N to impose its proposed rates in the following brief passages:

> [T]he rates sought by the L & N, which result in revenue/variable cost ratios of 180 percent (shipper-owned cars) and 177 percent (railroad-owned cars) are 15 and 12 percentage points above the present jurisdictional threshold. Clearly, given L & N's revenue inadequate status, its sought rates should not be considered excessive.

The Commission attempts to defend its action as supported by a "discernible and defensible" rationale by invoking (1) the deference accorded to agency findings; (2) the 30-day time constraint; and (3) the "limited" nature of deciding simply one rate case not setting a new rate standard.

Initially, it is undisputed that judicial deference is extended only to reasoned agency decisions. *Cleveland-Cliffs, supra.* As Judge Engel stated, it is manifestly the province of the Court to "determine whether those decisions comport with applicable law, whether they are supported by the evidence, and whether the rationale employed is both discernible and defensible." 664 F.2d at 580. Accordingly, the ICC may not avoid presenting a clear, legally defensible reason for its ratemaking by invoking "deference".

The second rationale for the ICC's decision is the time constraint of announcing a decision on state review cases within 30 days. 49 U.S.C. § 11501(c). However, that same subsection requires the Commission to, within 30 days, "determine and authorize the carrier to establish the appropriate rate." *Id.* (emphasis added). The plain mandate of the statute to set *"the* appropriate rate" (emphasis added) leaves little doubt that Congress did not authorize the ICC to simply issue an interim rate, leaving for the indefinite future the difficult and perhaps complex task of fixing the appropriate tariff in a proper manner. It is not persuasive to argue that the statute cannot apply simply because it is burdensome.

The final purported basis for the Commission's action is similar to the preceding one. The ICC urges that because its decision is "limited" to one rail tariff for one local service rather than a fully applied standard for setting rail rates, the Court should accord its action greater deference and not disturb its finding.

Recourse to the concise language of the statute discloses that the Commission has no authority to set interim, temporary or piece-meal rates subject to the future evolution of definitive rate-making guidelines. Congress provided that the "Commission shall take *final* action" within 30 days and *"determine \* \* \* the appropriate rate."* 49 U.S.C. § 11501(c). The present case is strikingly similar to the ICC's action in utilizing its previous rail rate formula. Prior to employing the "ton/ton-mile", the ICC simply added 7% to the proven cost of a service for the generally stated reason that carriers were "revenue inadequate" and that some form of "differential pricing" was required. The D.C. Circuit in *San Antonio, supra,* rejected such standardless,

haphazard ratemaking in language directly applicable herein:

> Even though differential pricing thus may be a legitimate criterion for the ICC to consider in the San Antonio ratemaking proceeding, the Commission still must provide adequate justification for its choice of a particular increment above fully allocated costs. In *San Antonio III,* however, the ICC did no more than make the general assertion that it could not find that the railroads had achieved revenue adequacy. There is nothing in the record in the way of findings, evidence, or rationale to support the seven percent solution or any percentage solution. The Commission's general allusion to the need to consider the revenue requirements of the carriers and the economics of differential pricing is so broad as to be meaningless as a standard—this rationale could be put forth just as readily in an attempt to justify a 1%, 21%, 45% or even a 99% additive. The Commission here defends its action on the ground that adoption of the appropriate additive involves a policy judgment that is not susceptible to precise quantification. *Concededly the problem is a difficult one, but that does not excuse the Commission from articulating "fully and carefully the methods by which, and the purposes for which, it has chosen to act."*
>
> In *San Antonio III,* the Commission listed four criteria that it stated would be used to assess the extent to which particular movements should be required to subsidize other services, but the ICC then completely ignored this standard in its indiscriminate selection of the seven percent additive. Apparently the Commission assumed that because its solution assertedly was a temporary one, it was relieved from its responsibility to follow any standard whatsoever. That notion provides little comfort to those affected by the ratemaking proceeding and is irreconcilable with *established principles of reasoned decisionmaking.*

631 F.2d at 852 (footnotes omitted) (emphasis added).

Finally, it must be noted that the single reason alluded to by the ICC in its decision for accepting the L & N's own rate proposal is that those tariffs would yield the carrier revenues only "15 and 12 percentage points above the jurisdictional threshold." As has been previously discussed, the statute explicitly *forbids* the ICC to utilize the jurisdictional figures to "establish a presumption that * * * the proposed rate exceeds or does not exceed a reasonable maximum." 49 U.S.C. § 10709(d)(4)(B). Thus, to the extent that the ICC rate order does offer a stated rationale, that rationale is patently illegal.

Accordingly, the ICC ruling must be vacated. Inasmuch as the KRC decision rests upon a certified standard and produces a rate not shown to be inconsistent with the Staggers Act, the tariff promulgated by the KRC is hereby ORDERED reinstated.