730 F.2d 339
 The STATE OF TEXAS, et al., Plaintiffs-Appellants,
National Association of Regulatory Utility Commissioners and
State Corp. Commission of the State of Kansas,
Plaintiffs-Intervenors-Appellants,
v.
UNITED STATES of America and Interstate Commerce Commission,
Defendants-Appellees,
and
Southern Pacific Transportation Company, et al.,
Defendants-Intervenors-Appellees.
 No. 82-1693.
 United States Court of Appeals,
Fifth Circuit.
 April 23, 1984.
 
 Wm. Paul Rodgers, Jr., Charles D. Gray, Nat'l Ass'n of Regulatory Utility Com'rs, Washington, D.C., for Nat'l Ass'n of Reg. Utility Comm.
 Walter Davis, Asst. Atty. Gen., Austin, Tex., for State of Tex., et al.
 Dennis D. Ahlers, Asst. Gen. Counsel, Kansas Corp. Comm., Topeka, Kan., for State Corp. Com'n of Kansas.
 Hugh P. Shovlin, Asst. U.S. Atty., San Antonio, Tex., Edward R. Cohen, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for U.S.A. and I.C.C.
 Crady & Peden, Hugh L. McCulley, Houston, Tex., for Southern Pacific Transp. Co.
 Michael E. Roper, Dallas, Tex., for Missouri-Kansas-Texas R. Co.
 Wilson, Grosenheider & Burns, Robert B. Burns, Jr., Austin, Tex., for The Atchison, Topeka and Santa Fe Ry.
 Clark, Thomas, Winters & Shapiro, Donald Scott Thomas, Jr., Austin, Tex., for Missouri Pacific R. Co. and Ass'n of American Railroads.
 Steptoe & Johnson, Betty Jo Christian, Stephen Ailes, Washington, D.C., for Ass'n of American Railroads.
 Donal L. Turkal, St. Paul, Minn., for Burlington Northern R. Co.
 Charles B. Evans, St. Augustine, Fla., William H. Teasley, Washington, D.C., for Florida Railroads.
 Neill W. McArthur, Jr., Jacksonville, Fla., Small, Craig & Werkenthin, James M. Alsup, Austin, Tex., for Seaboard Coast Line R.R., et al.
 John P. Legendre, Dallas, Tex., for Missouri Pacific R.R.
 Appeals from the United States District Court for the Western District of Texas.
 Before WISDOM, REAVLEY and JOHNSON, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This appeal involves a facial attack on the constitutionality of sections 201, 202, 203, and 214 of the Staggers Rail Act of 1980,[1] 49 U.S.C.A. Secs. 10501, 10701a, 10707a, 10709, 11501 (1983). Seeking a declaratory judgment that the challenged sections of the Staggers Act are unconstitutional, the State of Texas initiated this case on December 12, 1980, by filing suit against the United States and the Interstate Commerce Commission (ICC). Numerous parties intervened as plaintiffs and defendants. After receiving cross motions for summary judgment and hearing oral argument on those motions, the district court issued an order granting summary judgment to the defendants and the defendant-intervenors, denying summary judgment to the plaintiff and the plaintiff-intervenors, and dismissing the case with prejudice. The plaintiff and two plaintiff-intervenors have appealed that order. We affirm.
 
 I.
 
 2
 The Staggers Act is an attempt to revitalize the nation's railroad system by substantially deregulating rate-setting for interstate rail carriers. In essence, the Act allows interstate rail carriers that operate in competitive markets to establish their own rates. To eliminate regulatory lag and to ensure that the federal goal of deregulation is not thwarted by continued state regulation, the Act displaces the authority of the states independently to regulate the intrastate rates of interstate rail carriers. The appellants argue that these two aspects of the Act--deregulation of rate-setting and displacement of independent state regulation--violate various provisions of the Constitution. A brief review of the previous system of regulation is necessary to understand completely these two aspects of the Act.
 
 
 3
 In 1973, the bankruptcy of certain major railroads in the northeast and midwest regions of the country threatened the national welfare. Seven of these railroads, including the Penn Central with its huge system, were located principally in the Northeast. Congress responded with an innovative program designed to replace the inefficient, costly, and often duplicative insolvent lines with a new and economically viable rail system, Consolidated Rail Corporation (Conrail). Regional Rail Reorganization Act of 1973, Pub.L. No. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C.A. Secs. 701-797m (1983)). Although this legislation offered hope for improvement in the Northeast Corridor, by 1976 Congress recognized the necessity for introducing substantial nationwide changes in the regulation of railroad rates and service conditions. The railroad industry was in serious financial trouble, largely because the industry had become overregulated while competing modes of transportation remained for the most part unregulated.[2] Accordingly, Congress inaugurated a policy of deregulating railroad rate-setting by enacting the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act), Pub.L. No. 94-210, 90 Stat. 31 (codified as amended at 45 U.S.C.A. Secs. 801-855 (1983)). Since the enactment of the Interstate Commerce Act in 1887, the ICC had used the "just and reasonable" standard to review the rates of carriers subject to its jurisdiction. Under the 4R Act, the ICC could not find a railroad rate unjust or unreasonable unless the Commission had first determined that the carrier could exclude effective competition to such an extent that the carrier could be said to have "market dominance".[3] See 4R Act Sec. 202(b), 90 Stat. at 35.
 
 
 4
 Four years later, Congress found that the railroad industry was still plagued by the same financial problems that faced it in 1976.[4] Deregulation of railroad rate-setting under the 4R Act was not proceeding quickly enough.[5] Congress enacted the Staggers Rail Act of 1980, making dramatic changes designed to give carriers the freedom to set competitive rates determined mainly by market forces.[6] Section 201 of the Act establishes the basic premise of deregulation:
 
 
 5
 "(a) Except as [otherwise] provided ... a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may establish any rate for transportation or other service provided by the carrier.
 
 
 6
 "(b)(1) If the Commission determines, under section 10709 of this title, that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable."
 
 
 7
 49 U.S.C.A. Sec. 10701a(a), (b) (1983). Section 202 of the Act amends the application of the "market dominance" concept so as to free more railroad traffic from rate regulation. See id. Sec. 10709(d). Section 203 creates a permissible zone of rate flexibility, within which rate increases enjoy a qualified immunity from reasonability challenges. Id. Sec. 10707a.
 
 
 8
 The Staggers Act also institutes a major reallocation of regulatory authority between the federal and state governments. Previously, a dual jurisdictional system of regulation governed rate-setting by interstate rail carriers. The ICC exercised plenary jurisdiction over rail transportation between different states and between the United States and other countries. See 49 U.S.C.A. Sec. 10501(a) (1983). Section 10501(b) of title 49 specifically prohibited ICC jurisdiction over rail transportation "entirely in a State", and primary jurisdiction over intrastate rates and services remained in the individual state regulatory commissions. Section 10501(c) provided that, unless a state requirement conflicted with an order of the ICC or was expressly prohibited by the Interstate Commerce Act, the authority granted the ICC by Congress "does not affect the power of a State, in exercising its police power, to require reasonable intrastate transportation by carriers providing transportation subject to the jurisdiction of the Commission".
 
 
 9
 In connection with this division of regulatory jurisdiction between the ICC and the states, the ICC exercised a role of limited review over intrastate rate-setting. Codified at 49 U.S.C.A. Sec. 11501 (1983), this reviewing role recognized two circumstances in which the ICC would establish intrastate rates for rail carriers otherwise subject to the Commission's jurisdiction: (1) when the Commission found, after notice and a hearing, that a rate, classification, rule, or practice established by a state regulatory agency caused unreasonable discrimination against or an unreasonable burden on interstate or foreign commerce, id. Sec. 11501(a);[7] or (2) when"(A) a rail carrier files with an appropriate State authority a change in an intrastate rate, or a change in a classification, rule, or practice that has the effect of changing an intrastate rate, that adjusts the rate to the rate charged on similar traffic moving in interstate or foreign commerce; and
 
 
 10
 "(B) the State authority does not act finally on the change by the 120th day after it was filed",
 
 
 11
 Id. Sec. 11501(d)(1).[8] Beyond these two specific instances, states and their regulatory commissions were free to determine intrastate rail policy.
 
 
 12
 As noted above, the basic purpose of the Staggers Act is to revive the railroad industry by hastening the deregulation of railroad rate-setting. In addressing this purpose, Congress found that the dual federal-state regulatory structure was causing substantial costs to interstate rail carriers.[9] Congress found these losses to result partly from a lack of uniform standards and partly from the regulatory delay inherent in the dual system.[10] The congressional response to this problem was to eliminate independent state regulation of the intrastate rates of interstate rail carriers. To this end, section 214 of the Staggers Act radically revises the regulatory structure governing intrastate rail rates and services.
 
 
 13
 Section 214 preempts outright all state jurisdiction over general rate increases,[11] inflation-based rate increases, and fuel adjustment surcharges.[12] 49 U.S.C.A. Sec. 11501(b)(6) (1983). If a state wishes to continue regulating other types of intrastate rate adjustments for interstate carriers, the ICC must certify that the state's standards and procedures conform to those of the Interstate Commerce Act. Id. Sec. 11501(b)(1)-(3). States that do not seek, or that fail to receive, ICC certification cannot exercise any jurisdiction over the intrastate rates of interstate railway carriers. Id. Secs. 10501(c)(1), 11501(b)(4)(A).[13] In states in which certification has been denied, the ICC assumes jurisdiction over all rate-setting by interstate carriers. Id. Sec. 11501(b)(4)(B). If a state has received ICC certification, a decision of the certified state agency can be challenged and reversed on the ground that the agency reached its decision using regulatory standards and procedures not in accordance with the provisions of the Interstate Commerce Act. Id. Sec. 11501(c). The ICC certification of a state authority is valid for five years; during this period, any changes in the certified standards and procedures must be expressly approved by the ICC. Id. Sec. 11501(b)(5). At the end of the five-year period, the ICC certification of a state authority must be renewed. Id. Sec. 11501(b)(5)(A).
 
 
 14
 In short, section 214 of the Staggers Act establishes a two-step process to compel state regulators to employ federal law when regulating intrastate rates of interstate rail carriers. First, to avoid complete federal preemption, a state agency must receive ICC certification of its standards and procedures. Second, to avoid ICC reversal of its decisions, a certified state agency must exercise its authority in accordance with the standards and procedures of the Interstate Commerce Act. Thus, although the Staggers Act grants the states the option of continuing to regulate intrastate rail rates, the Act is in nature a preemptive statute. If a state wishes to continue regulating, it must do so in accordance with federal policy.[14]
 
 
 15
 In concluding that the Act is preemptive, we are mindful of the clear-statement rule of statutory construction governing such a conclusion. Under this rule, a court cannot find that a federal law preempts state regulation of an activity historically regulated by the states, unless Congress has given a "clear statement" of its intent to preempt:
 
 
 16
 "Where, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' This assumption provides assurance that 'the federal-state balance' will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has 'unmistakably ... ordained' that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."
 
 
 17
 Jones v. Rath Packing Co., 1977, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (citations omitted). Accord Florida Lime & Avocado Growers, Inc. v. Paul, 1963, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248; California v. Zook, 1949, 336 U.S. 725, 733, 69 S.Ct. 841, 845, 93 L.Ed. 1005; Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447; Savage v. Jones, 1912, 225 U.S. 501, 537, 32 S.Ct. 715, 727, 56 L.Ed. 1182.
 
 
 18
 The preemption of state law implicit in the goals and operation of the Staggers Act is unmistakable. One of the Act's primary purposes is the elimination of the previous lack of uniformity in standards and procedures that governed rate-setting by interstate rail carrier (see notes 9-10), and the certification procedure of section 214 of the Act is tailored to this purpose. When Congress seeks to end a situation of conflicting regulatory schemes and to establish uniform regulatory standards, it has clearly manifested its intent to preempt state law. See City of Burbank v. Lockheed Air Terminal, Inc., 1973, 411 U.S. 624, 633, 638-39, 93 S.Ct. 1854, 1859, 1862-63, 36 L.Ed.2d 547; Campbell v. Hussey, 1961, 368 U.S. 297, 300-01, 82 S.Ct. 327, 328-29, 7 L.Ed.2d 299; Rice v. Santa Fe Elevator Corp., 331 U.S. at 234, 67 S.Ct. at 1154; Hines v. Davidowitz, 1941, 312 U.S. 52, 72-74, 61 S.Ct. 399, 407-08, 85 L.Ed. 581.
 
 
 19
 That Congress intended the Staggers Act to preempt state law is manifest not only by the purpose and operation of the statute, but also by the language of the statute and of its legislative history. Section 214(b) of the Act provides that a state agency may exercise jurisdiction over the intrastate rates of interstate carriers "only ... if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle". 49 U.S.C.A. Sec. 11501(b)(1) (1983) (emphasis added). Even more explicit is the language of the House Conference Report:
 
 
 20
 "The conferees' intent is to ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc., which are not in accordance with these goals. Accordingly, the Act preempts state authority over rail rates, classifications, rules, and practices. States may only regulate in these areas if they are certified under the procedures of [section 214]."
 
 
 21
 Conference Report, note 4, at 106 [4138] (emphasis added); see also House Report, note 4, at 221 [4104] (separate views of Rep. Murphy); id. at 225-26 [4107-08] (statement of Reps. Gramm, Stockman, Shelby, Santini, Eckhardt, and Satterfield). Of course, such explicit statements are dispositive of the issue of congressional intent to preempt state law. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. at 142, 146-47, 83 S.Ct. at 1217, 1219-20; L. Tribe, American Constitutional Law Sec. 6-26, at 386 (1978).
 
 II.
 
 22
 The appellants attack the facial constitutionality of the Staggers Act on four fronts. They argue that: (A) section 214 of the Act exceeds the power of Congress under the commerce clause; (B) section 214 violates the tenth amendment; (C) section 214 violates the guaranty clause; and (D) sections 201 through 203 of the Act effect an unconstitutional "taking" of property without just compensation.[15] We hold that the Act withstands all four attacks.[16]
 
 III.
 A.
 
 23
 The appellants assert that the commerce clause does not confer upon Congress the authority to enact the preemption scheme of section 214 of the Staggers Act. We disagree.
 
 
 24
 Under accepted commerce clause analysis, the task of a court asked to determine whether a particular act of Congress is a valid exercise of the commerce power is narrow. The court must defer to a congressional finding that a regulated activity substantially affects interstate commerce, as long as there is any rational basis for such a finding. This established, the only remaining question for judicial inquiry is whether there is a reasonable connection between the regulatory means selected and the asserted ends. E.g., Hodel v. Indiana, 1981, 452 U.S. 314, 323-24, 101 S.Ct. 2376, 2382-83, 69 L.Ed.2d 40; Hodel v. Virginia Surface Mining & Reclamation Association, 1981, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1; Heart of Atlanta Motel, Inc. v. United States, 1964, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258.
 
 
 25
 Section 214 of the Staggers Act clearly passes constitutional muster under the "minimum scrutiny" test required by accepted commerce clause analysis. At least since 1914, the courts have recognized that the regulation of intrastate railroad rates has a direct and substantial effect on interstate commerce. Houston East & West Texas Railway v. United States (Shreveport Rate Case), 1914, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341. See also Railroad Commission v. Chicago, Burlington & Quincy Railroad, 1922, 257 U.S. 563, 588, 42 S.Ct. 232, 237, 66 L.Ed. 371. The information presented to Congress during its consideration of the Staggers Act furnished ample evidence that independent state regulation of the intrastate rates of interstate rail carriers was imposing substantial costs upon those carriers.[17] It is undeniable, therefore, that there is a rational basis for the congressional finding of a substantial effect upon interstate commerce. It is equally clear that there is a reasonable connection between the regulatory means chosen--preemption of independent state regulation--and the asserted objective--deregulation of rate-setting for interstate carriers. Under accepted commerce clause reasoning, then, section 214 is a valid exercise of the commerce power.[18]
 
 
 26
 The appellants argue that, for three separate reasons, this Court should depart from accepted commerce clause reasoning in adjudging the validity of section 214 as an exercise of the commerce power. First, citing the Shreveport Rate Case, 234 U.S. at 351, 353, 34 S.Ct. at 836, 837, and Railroad Commission v. Chicago, Burlington & Quincy Railroad, 257 U.S. at 590-91, 42 S.Ct. at 238, the appellants argue that Congress can regulate intrastate commerce only if such regulation is necessary to protect interstate commerce from unreasonable burdens. Because the prior regulatory regime allowed the ICC to overturn state-set rates found to discriminate against or burden interstate commerce unreasonably, the appellants contend, the prior regime was sufficient to protect interstate commerce from injurious intrastate rates. They say, therefore, that section 214 of the Staggers Act is both unnecessary and excessive, for it fails to distinguish burdensome state regulation from non-burdensome state regulation.
 
 
 27
 This argument rests on erroneous premises. The Supreme Court decided the Shreveport Rate Case and the Railroad Commission case at a time when the commerce power was considered to reach only activities that were "in" interstate commerce or that exerted a "direct" effect on interstate commerce. See, e.g., Stern, The Commerce Clause and the National Economy, 1933-1946 (pt. 1), 59 Harv.L.Rev. 645, 647-53 (1946). These decisions predate the development of contemporary commerce clause analysis and therefore cannot be considered to express accurately the extent of the commerce power. For over 40 years now, the Supreme Court has held that a purely intrastate activity may be regulated by Congress, as long as the cumulative effect of the activity substantially affects interstate commerce. See Wickard v. Filburn, 1942, 317 U.S. 111, 127-28, 63 S.Ct. 82, 90-91, 87 L.Ed. 122; see also United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726; Katzenbach v. McClung, 1964, 379 U.S. 294, 300-01, 85 S.Ct. 377, 381-82, 13 L.Ed.2d 290; Fry v. United States, 1975, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363; Hodel v. Virginia Surface Mining & Reclamation Association, 1981, 452 U.S. 264, 281, 101 S.Ct. 2352, 2362, 69 L.Ed.2d 1. As the Supreme Court recently stated,
 
 
 28
 "[T]his Court has made clear that the commerce power extends not only to 'the use of channels of interstate or foreign commerce' and to 'protection of the instrumentalities of interstate commerce ... or persons or things in commerce,' but also to 'activities affecting commerce.' Perez v. United States, 402 U.S. 146, 150, 28 L.Ed.2d 686, 91 S.Ct. 1357 [1359] (1971). As we explained in Fry v. United States, [421 U.S. at 547, 95 S.Ct. at 1795], '[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.' "
 
 
 29
 Hodel, 452 U.S. at 276-77, 101 S.Ct. at 2360-61 (citations omitted).[19] And in determining whether the regulated intrastate activity substantially affects interstate commerce, the "rational basis" test governs judicial inquiry. See FERC v. Mississippi, 1982, 456 U.S. 742, 753-54, 102 S.Ct. 2126, 2134-35, 72 L.Ed.2d 532; Hodel, 452 U.S. at 291, 101 S.Ct. at 2368; United States v. Darby, 1941, 312 U.S. 100, 121, 61 S.Ct. 451, 460, 85 L.Ed. 609. Thus, it is simply not true that Congress can regulate intrastate commerce only to protect interstate commerce from unreasonable burdens.
 
 
 30
 Moreover, whether section 214 of the Staggers Act is unnecessary or excessive in the light of the objectives of Congress is a question that courts are neither well suited nor constitutionally authorized to decide. The effectiveness of existing law and the necessity for new law in dealing with a problem identified by Congress as a problem appropriate for solution by Congress is a matter committed to legislative judgment. Hodel, 452 U.S. at 283, 101 S.Ct. at 2363; see McCulloch v. Maryland, 1819, 17 U.S. (4 Wheat.) 316, 423, 4 L.Ed. 579. Once we find a reasonable relation between the means selected and the end desired, our analysis is concluded.
 
 
 31
 Second, the appellants argue that Congress should face a heavier burden of persuasion in justifying an exercise of the commerce power if the effect of the congressional action is complete preemption of an area of state law. We reject this argument for two reasons. First, it lacks any precedential basis: The Supreme Court has applied the standard commerce clause analysis to determine the validity of preemptive statutes. See FERC v. Mississippi, 1982, 456 U.S. 742, 754, 102 S.Ct. 2126, 2134, 72 L.Ed.2d 532. Second, concerns for state sovereignty are already served by the clear-statement rule of statutory construction that applies to preemptive statutes. Under this rule, federal law will not be held to preempt state regulation of an activity historically regulated by the states, unless statutory language or legislative history constitutes a clear direction that Congress intended to exercise its commerce power in full. See supra at 346-347. The clear-statement doctrine prevents Congress from using ambiguous statutory intent to conceal its failure to accommodate the competing interests bearing on the federal-state balance of power; the doctrine thus increases the likelihood that Congress will give full attention to the interests of the states when it considers preemptive legislation. See United States v. Bass, 1971, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488; L. Tribe, American Constitutional Law Sec. 5-8, at 244 (1978); id. Sec. 5-20, at 304.
 
 
 32
 Third, the appellants assert that the commerce power is less extensive when Congress is engaging in economic regulation than it is when Congress is acting to protect individual rights. They argue that the "rational basis" test of Heart of Atlanta Motel and Katzenbach v. McClung should be limited to the context of statutes involving the protection of individual civil rights. This argument lacks both supporting authority and merit.
 
 
 33
 Because there are no cases directly supporting the appellants' position, the appellants argue by analogy from cases holding that state governments are less restricted by the commerce clause when they legislate against racial discrimination than they are when they legislate in the realm of economic regulation. See Colorado Anti-Discrimination Commission v. Continental Air Lines, 1963, 372 U.S. 714, 721-22, 83 S.Ct. 1022, 1025-26, 10 L.Ed.2d 84; Bob-Lo Excursion Co. v. Michigan, 1948, 333 U.S. 28, 34-40, 68 S.Ct. 358, 361-364, 92 L.Ed. 455. These decisions are inapposite, for they deal with the validity of state regulations that incidentally burden interstate commerce. In analyzing the validity of such state laws, the Supreme Court has formulated a balancing test in which the laws will be upheld "unless the burden on [interstate] commerce is clearly excessive in relation to the putative local benefits". Pike v. Bruce Church, Inc., 1970, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (emphasis added). Accordingly, in such cases the power of a state government will vary directly with the importance of the local interest served by the legislation in question. The situation presented by a congressional statute enacted under the commerce clause is completely different. In such instances, Congress exercises a power that "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution". Gibbons v. Ogden, 1824, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23. Because of the plenary nature of the commerce power and because of the primacy accorded federal law by the supremacy clause,[20] the balance of interests between the federal and state governments is an inappropriate consideration in determining whether a federal act is a valid exercise of the commerce power.[21] See Fidelity Federal Savings & Loan Association v. de la Cuesta, 1982, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664; Free v. Bland, 1962, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180; United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 569, 59 S.Ct. 993, 1011, 83 L.Ed. 1446; Shreveport Rate Case, 234 U.S. at 350, 34 S.Ct. at 835. If an activity affects interstate commerce substantially, the power of Congress to regulate that activity is not affected by whether Congress is engaging in economic regulation or seeking to protect civil rights.
 
 
 34
 A fundamental defect in the appellants' argument is that there are a number of Supreme Court decisions applying the traditional commerce clause analysis to instances of economic regulation. See, e.g., FERC v. Mississippi, 1982, 456 U.S. 742, 754, 102 S.Ct. 2126, 2134, 72 L.Ed.2d 532; Hodel v. Indiana, 1981, 452 U.S. 314, 323-24, 101 S.Ct. 2376, 2382-83, 69 L.Ed.2d 40; National League of Cities v. Usery, 1976, 426 U.S. 833, 840, 96 S.Ct. 2465, 2469, 49 L.Ed.2d 245.[22] There is also language in Heart of Atlanta Motel repudiating the notion that congressional power under the commerce clause varies with the purpose of the legislation. Referring to decisions upholding congressional uses of the commerce power, the Court said: "That Congress was legislating against moral wrongs in many of these areas rendered its enactments no less valid." 379 U.S. at 257, 85 S.Ct. at 357. If the Supreme Court has erred in applying standard commerce clause reasoning to statutes dealing with economic regulation, then it is for the Supreme Court, not the Fifth Circuit Court of Appeals, to correct that error.
 
 
 35
 In summary, we are unwilling to hold that the usual scope of the commerce power does not apply to federal legislation that addresses intrastate activity, preempts state law, or concerns economic regulation. We decline to create a hierarchy of powers within the scope of the commerce clause; we decline to create internal doctrinal limitations on congressional use of the commerce power. We adhere to the traditional notion of the commerce clause as a source of plenary authority, a power that knows no internal doctrinal limitations other than the requirement of a substantial effect upon interstate commerce. Any more significant judicial constraint upon that power must derive from some other provision of the Constitution:
 
 
 36
 "[I]f meaningful judicial limits on congressional power are to be devised to backstop legislative processes, it is not clear that the commerce clause provides an appropriate doctrinal context. To the extent that doctrine shapes the Supreme Court's perceptions, it is unlikely that congressional abuse of the commerce power could reliably be 'seen' from the commerce clause perspective, given the multiple rationality standards of contemporary commerce clause doctrine. A more appropriate doctrinal form is suggested by the paradigm of the Bill of Rights, the source of those judicial limitations that are currently most often enforced. Instead of attempting to fence Congress in--in the pre-1937 manner but with a little more running room--courts would do better to protect the values threatened by congressional abuse of the commerce power by fencing Congress out--denying the validity of particular congressional acts without altering the general shape of commerce clause doctrine."
 
 
 37
 L. Tribe, American Constitutional Law Sec. 5-7, at 240-41 n. 2 (1978).
 
 
 38
 Having found section 214 of the Staggers Act to be a valid exercise of power under the commerce clause, we now examine whether the Act is invalid because of any "external" constraints upon commerce clause legislation.
 
 B.
 
 39
 The tenth amendment[23] is the primary focus of the appellants' appeal. Drawing upon the Supreme Court's decision in National League of Cities v. Usery, 1976, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245, the appellants argue that section 214 of the Staggers Act is an unconstitutional intrusion upon the sovereignty of the states. We disagree.
 
 
 40
 In National League of Cities, the Supreme Court decided that congressional application of the minimum wage and overtime provisions of the Fair Labor Standards Act to state and local government employees violated constitutional rights of state sovereignty. Until that case, the tenth amendment was understood by constitutional scholars as simply a confirmation of the original understanding that powers not granted to the United States were reserved to the states or to the people. "It added nothing to the instrument as originally ratified...." United States v. Sprague, 1931, 282 U.S. 716, 733, 51 S.Ct. 220, 222, 75 L.Ed. 640. "The amendment states but a truism that all is retained which is not surrendered." United States v. Darby, 1941, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609. In McCulloch v. Maryland, 1819, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579, counsel for the State of Maryland relied on the tenth amendment in arguing that the power to create corporations was reserved to the states by that amendment. Chief Justice Marshall rejected the argument, pointing out that the tenth amendment, unlike the corresponding provision in the Articles of Confederation, omitted the word "expressly" as a qualification of granted powers. 17 U.S. (4 Wheat.) at 406-07, 4 L.Ed. 579. The refusal of both houses of the first Congress to insert in the amendment the word "expressly" before the word "delegated" indicates that the provision was not conceived to be a yardstick for measuring the power granted to the federal government or reserved to the states. 1 Annals of Cong. 767-68 (1789); 2 B. Schwartz, The Bill of Rights: A Documentary History 1150-51 (1971). Madison confirmed this view in the course of the debate (which took place while the proposed amendment was pending) concerning Hamilton's plan to establish a national bank: "Interference with the power of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they might exercise it, although it should interfere with the laws, or even the constitutions of the States." 2 Annals of Cong. 1897 (1791). Thus, "[f]rom the beginning and for many years the amendment has been construed as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." United States v. Darby, 312 U.S. at 124, 61 S.Ct. at 462.
 
 
 41
 Be that as it may, the Supreme Court has not extended the unorthodox view of the tenth amendment expressed in National League of Cities. As the Court held in EEOC v. Wyoming, 1983, 460 U.S. ---, 103 S.Ct. 1054, 1061, 75 L.Ed.2d 18, before congressional legislation enacted under the commerce power can be held an unconstitutional intrusion on state sovereignty, the legislation must satisfy each part of a three-part test. First, the statute must regulate the "States as States", National League of Cities, 426 U.S. at 854, 96 S.Ct. at 2475; second, the statute must address matters that are indisputably "attribute[s] of state sovereignty", id. at 845, 96 S.Ct. at 2471; and third, it must be apparent that state compliance with the federal statute would directly impair the states' ability "to structure integral operations in areas of traditional governmental functions," id. at 852, 96 S.Ct. at 2474. See also FERC v. Mississippi, 1982, 456 U.S. 742, 764 n. 28, 102 S.Ct. 2126, 2139 n. 28, 72 L.Ed.2d 532; United Transportation Union v. Long Island Railroad, 1982, 455 U.S. 678, 684, 102 S.Ct. 1349, 1353, 71 L.Ed.2d 547; Hodel v. Virginia Surface Mining & Reclamation Association, 1981, 452 U.S. 264, 287-88, 101 S.Ct. 2352, 2365-66, 69 L.Ed.2d 1. Even if these three requirements are met, the federal statute will be upheld if the federal interest served is so compelling as to justify state submission. EEOC v. Wyoming, 103 S.Ct. at 1061; United Transportation Union v. Long Island Railroad, 455 U.S. at 684 n. 9, 102 S.Ct. at 1353 n. 9; Hodel, 452 U.S. at 288 n. 29, 101 S.Ct. at 2366 n. 29.
 
 
 42
 Section 214 of the Staggers Act does not affirmatively compel the states to administer federal policy. We conclude, therefore, that it does not regulate the states as states. The appellants' tenth amendment argument thus does not meet the first part of the three-part test.
 
 
 43
 The appellants contend that section 214 does regulate the states as states because it attempts to control the way the states regulate intrastate railroad rates. They say that the section gives the ICC direct control over state standards and procedures, in effect regulating the states in their traditional role of governing their internal economics. This characterization of section 214 is misleading. The more correct view is that section 214 preempts state law governing an activity that affects interstate commerce, but gives the states the option either to continue regulation in compliance with federal law or to cease independent regulation altogether. Because the states have this option, because there is no affirmative coercion of the states by the federal government, the Act does not implicate the two principal concerns underlying tenth amendment jurisprudence: political accountability and separation of powers.
 
 
 44
 Until recently, it was well accepted that the representation of state interests in Congress by representatives elected from the states, coupled with the political accountability of Congress for federal legislation, furnished inherent political protection of the states' claim to the measure of sovereignty accorded them in the Constitution. The political process could be counted on to produce fair compromises between the federal and state governments. The judiciary, therefore, should adopt a position of extreme deference to congressional judgments concerning the allocation of power between those two levels of government. The classic exposition of this theory is that developed in Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum.L.Rev. 543 (1954). See also, e.g., National League of Cities, 426 U.S. at 857, 876-77, 96 S.Ct. at 2476, 2486-87 (Brennan, J., dissenting); Helvering v. Gerhardt, 1938, 304 U.S. 405, 416, 58 S.Ct. 969, 973, 82 L.Ed. 1427; Gibbons v. Ogden, 1824, 22 U.S. (9 Wheat.) 1, 197, 6 L.Ed. 23; The Federalist No. 46, at 316-19 (J. Madison) (J. Cooke ed. 1961); Bogen, The Hunting of the Shark: An Inquiry Into the Limits of Congressional Power Under the Commerce Clause, 8 Wake Forest L.Rev. 187, 197-98 (1972); Choper, On the Warren Court and Judicial Review, 17 Cath.U.L.Rev. 20, 38-41 (1967); La Pierre, The Political Safeguards of Federalism Redux: Intergovernmental Immunity and the States as Agents of the Nation, 60 Wash.U.L.Q. 779, 787, 987 (1982).
 
 
 45
 The Supreme Court departed from this long-held political philosophy in National League of Cities. See especially 426 U.S. at 841 n. 12, 96 S.Ct. at 2469 n. 12. Some commentators agree with that departure. See The Supreme Court, 1982 Term, 97 Harv.L.Rev. 70, 207 n. 70 (1983), and the authorities there cited. When Congress compels state governments to carry out federal policy, it evades responsibility for the resulting regulation and thereby circumvents the political check on infringements of state sovereignty:
 
 
 46
 "Local citizens hold [state agencies] accountable for the choices they make.... Congressional compulsion of state agencies ... blurs the lines of political accountability and leaves citizens feeling that their representatives are no longer responsive to local needs.... [N]ational officials tend to force state governments to administer unpopular programs, thus transferring political liability for those programs to the States."
 
 
 47
 FERC v. Mississippi, 1982, 456 U.S. 742, 787 & n. 19, 102 S.Ct. 2126, 2135 & n. 19, 72 L.Ed.2d 532 (O'Connor, J., dissenting); accord La Pierre, supra, at 988-89, 991; Stewart, Pyramids of Sacrifice? Problems of Federalism in Mandating State Implementation of National Environmental Policy, 86 Yale L.J. 1196, 1243-44 (1977); The Supreme Court, 1981 Term, 96 Harv.L.Rev. 62, 191, 196 (1982).[24] Thus, when state agencies are compelled to regulate in accordance with federal law, it is inappropriate for the courts simply to rely on the political process, in effect abdicating their powers to Congress.
 
 
 48
 Conversely, the political accountability of Congress remains intact in the absence of direct congressional coercion of state action. If Congress enforces federal policy through its own agencies, the electorate will hold Congress responsible for that policy. Congressional preemption of state regulation therefore does not implicate concerns of political accountability. See FERC, 456 U.S. at 787, 102 S.Ct. at 2152 (O'Connor, J., dissenting); La Pierre,supra, at 990-98. The same is true when, as with section 214 of the Staggers Act, a federal statute offers states a choice between regulating in accordance with federal law and ceasing regulation. If the state chooses to cease regulation, the ensuing regulatory regime will be federally administered and therefore attributed to the federal government; if the state opts for administering the federal policy, it is appropriate for the state to be held at least partly responsible for that policy. Thus, federal legislation such as section 214 of the Staggers Act does not trigger the concern for political accountability that justifies judicial scrutiny of statutes that compel the states to carry out federal policy.
 
 
 49
 That the nature of the Staggers Act is such that the Act does not undermine congressional political accountability, however, is not alone sufficient to insulate the Act from an attack based upon the tenth amendment. The role of the states in our federal form of government is a vital component of the Constitution's overall scheme of separation of powers, a scheme designed to protect individual liberty by preventing excessive concentration of power in any one governmental organ. See San Diego Building Trades Council v. Garmon, 1959, 359 U.S. 236, 243, 79 S.Ct. 773, 778, 3 L.Ed.2d 775; The Federalist No. 46, at 321-22 (J. Madison) (J. Cooke ed. 1961); id. No. 51, at 351-53. Regardless whether Congress acts in a politically accountable manner, the courts must be prepared to intervene to protect the essential role of the states in the federal system:
 
 
 50
 "The notion that the sovereign position of the States must find its protection in the will of a transient majority of Congress is foreign to and a negation of our constitutional system.... The Constitution was designed to keep the balance between the States and the nation outside the field of legislative controversy."
 
 
 51
 New York v. United States, 1946, 326 U.S. 572, 594, 66 S.Ct. 310, 320, 90 L.Ed. 326 (Douglas, J., dissenting). Even though there are political safeguards protecting the independence of the executive branch of the national government,[25] the courts have not abdicated to congressional judgments concerning the distribution of power between the Executive and Congress when the courts perceived a threat to the separation of powers at the national level. See INS v. Chadha, 1983, --- u.s. ---, --- - ---, --- - ---, 103 s.ct. 2764, 2782-83, 2788-89, 77 L.Ed.2d 317, 342-43, 349-50. The courts should likewise not abdicate to Congress when it allocates power between the national and state levels of government, if that allocation threatens the separation of powers inherent in the federal design.
 
 
 52
 The source of judicially enforceable rights of state sovereignty is not so much the text of the tenth amendment[26] as it is the structural assumption of the Constitution as a whole that the states will remain separate and meaningful decision-making, functioning governmental entities.[27] See C. Black, Perspectives in Constitutional Law 40 (1963); L. Tribe, American Constitutional Law Sec. 5-7, at 241 (1978); id. Sec. 5-22, at 310. The Supreme Court has affirmed the concept of federalism as a structural assumption of the Constitution on a number of occasions:
 
 
 53
 "[T]he preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."
 
 
 54
 Texas v. White, 1869, 74 U.S. (7 Wall.) 700, 725, 19 L.Ed. 227.
 
 
 55
 "[T]he people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence.... [I]n many articles of the Constitution the necessary existence of the States and, within their proper spheres, the independent authority of the States, is distinctly recognized."
 
 
 56
 Lane County v. Oregon, 1869, 74 U.S. (7 Wall.) 71, 76, 19 L.Ed. 101; see also Helvering v. Gerhardt, 1938, 304 U.S. 405, 414-15, 58 S.Ct. 969, 972-73, 82 L.Ed. 1427.
 
 
 57
 Federal commerce power legislation that treats the states in a manner inconsistent with this constitutional assumption is therefore constitutionally suspect. Congress may not act in such a manner as to impair "the States' integrity or their ability to function effectively in a federal system". Fry v. United States, 1975, 421 U.S. 542, 547 n. 7, 95 S.Ct. 1792, 1795 n. 7, 44 L.Ed.2d 363; see also United Transportation Union v. Long Island Railroad, 1982, 455 U.S. 678, 686-87, 102 S.Ct. 1349, 1354-55, 71 L.Ed.2d 547.[28] Acts that regulate the "states as states" are inconsistent with the constitutional assumption of federalism, because such acts force the states to administer congressional policy judgments. In effect, such acts convert state agencies into tools of federal policy, and thereby threaten the independence of the states.[29] The suspect characteristic of such acts, then, is that the states are compelled to carry out federal policy. See National League of Cities, 426 U.S. at 852, 855, 96 S.Ct. at 2474, 2476; The Supreme Court, 1981 Term, 96 Harv.L.Rev. 62, 195 (1982); Note, Hodel v. Virginia Surface Mining Reclamation Association and Hodel v. Indiana, 10 Ecology L.Q. 69, 76 (1982).
 
 
 58
 In the absence of compulsion, however, congressional legislation that displaces state law does not endanger the separation of powers promoted by the federal system of government.[30] Accordingly, the Supreme Court has often affirmed the principle that the tenth amendment does not limit congressional power to preempt state law regulating private activity.[31] See EEOC v. Wyoming, 1983, 460 U.S. ---, 103 S.Ct. 1054, 1061 & n. 10, 75 L.Ed.2d 18; FERC v. Mississippi, 1982, 456 U.S. 742, 759, 102 S.Ct. 2126, 2137, 72 L.Ed.2d 532; Hodel v. Virginia Surface Mining & Reclamation Association, 1981, 452 U.S. 264, 286, 289-91, 101 S.Ct. 2352, 2365, 2366-68, 69 L.Ed.2d 1; see also Vehicle Equipment Safety Commission v. National Highway Traffic Safety Administration, 4 Cir.1979, 611 F.2d 53, 54-55; City of New York v. United States Department of Transportation, S.D.N.Y.1982, 539 F.Supp. 1237, 1253, rev'd on other grounds, 2 Cir.1983, 715 F.2d 732; La Pierre, supra, at 796 n. 55. Federal legislation that preempts state regulation of private activity does not regulate the states as states. Hodel, 452 U.S. at 288, 101 S.Ct. at 2366.
 
 
 59
 As we have noted above, the Staggers Act is in essence a preemptive statute. The federal policy of deregulating railroad rates is imposed regardless of the states' actions.[32] If a state wishes to continue to regulate the intrastate rates of interstate railroads, it must do so in accordance with federal standards and procedures. But the Act does not compel the states to administer federal law; any state may choose not to regulate. Therefore, the Act does not regulate the states as states.[33] The Supreme Court adopted similar reasoning in FERC and Hodel, each of which involved a statute similar in nature to section 214 of the Staggers Act. In Hodel the Court held:
 
 
 60
 "Thus, Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role."452 U.S. at 290, 101 S.Ct. at 2367. And in FERC the Court stated:
 
 
 61
 "... Congress could have pre-empted the field, at least insofar as private rather than state activity is concerned; PURPA [the statute in question] should not be invalid simply because, out of deference to state authority, Congress adopted a less intrusive scheme and allowed the States to continue regulating in the area on the condition that they consider the suggested federal standards.... There is nothing in PURPA 'directly compelling' the States to enact a legislative program. In short, because the two challenged Titles simply condition continued state involvement in a pre-emptible area on the consideration of federal proposals, they do not threaten the States' 'separate and independent existence,' and do not impair the ability of the States 'to function effectively in a federal system.' "
 
 
 62
 456 U.S. at 765-66, 102 S.Ct. at 2140-41 (citations and footnotes omitted; emphasis omitted).
 
 
 63
 Because the Staggers Act does not regulate the states as states, it does not offend National League of Cities.
 
 C.
 
 64
 The appellants argue that, because section 214 of the Staggers Act transfers authority from elected state officials to non-elected federal officials, it undermines the self-government of the states. The appellants assert that section 214 therefore violates the Constitution's guarantee of a republican form of government for each state.[34] We reject the argument.[35]
 
 
 65
 The appellants' argument is highly imaginative. It is also illimitable: If sustained, it would enable the states to destroy the ability of Congress to preempt state law. We have cited numerous cases recognizing that the only restraint on congressional preemptive power is the requirement that the regulated activity substantially affect interstate commerce. We cannot accept that the guaranty clause has either the meaning or the effect ascribed to it by the appellants. The Staggers Act does not violate the Constitution's guarantee of a republican form of government for each state.
 
 D.
 
 66
 The appellants argued before the district court that sections 201 through 203 of the Staggers Act would allow some railroads to charge monopoly rates, and therefore that the Act violated the fifth amendment by effecting an unconstitutional taking of property without just compensation. They contend on appeal that this argument presents genuine issues of material fact. They conclude, therefore, that the district court erred by granting summary judgment in favor of the defendants. The appellants are wrong.
 
 
 67
 Because the appellants' argument arises in the context of a facial attack upon the Staggers Act, it presents no concrete controversy concerning the application of the Act to particular persons or operations. See Hodel v. Virginia Surface Mining & Reclamation Association, 1981, 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1. The only question properly before the district court and, in turn, this Court, is whether the "mere enactment" of the Act constitutes a taking. Id.; Agins v. City of Tiburon, 1980, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106.
 
 
 68
 The mere enactment of a statute does not effect a taking of property if the statute advances legitimate governmental interests and if it does not deny a property owner economically viable use of his property. Tiburon, 447 U.S. at 260-63, 100 S.Ct. at 2141-43. That the Staggers Act advances legitimate governmental interests is undeniable. The appellants have made no allegations establishing as a genuine factual issue that the mere enactment of the Staggers Act denied them, or anyone, for that matter, economically viable use of their property. The district court's grant of summary judgment was proper.[36]
 
 IV.
 
 69
 The appellants challenge the constitutionality of sections 201, 202, 203, and 214 of the Staggers Act on four separate grounds. We sustain the Act against all four attacks. The Act is a valid exercise of the commerce power. It does not violate the asserted constitutional rights of states. It does not abridge the guaranty clause. It does not effect a taking of property without just compensation. The challenged sections of the Act are facially constitutional.
 
 
 70
 We AFFIRM the judgment of the district court.
 
 
 
 [1]
 Pub.L. No. 96-448, 94 Stat. 1895 (codified in various sections of 11, 45, and 49 U.S.C.A. (1983))
 
 
 [2]
 See S.Rep. No. 499, 94th Cong., 2d Sess. 2-3, 10-15, reprinted in 1976 U.S.Code Cong. & Ad.News 14, 15-17, 23-29
 
 
 [3]
 The 4R Act defined "market dominance" as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies". 4R Act Sec. 202(b), 90 Stat. at 35. The slightly amended version of this definition is at 49 U.S.C.A. Sec. 10709(a) (1983)
 
 
 [4]
 See Staggers Act Sec. 2(4), (6), (7), (9); H.R.Rep. No. 1035, 96th Cong., 2d Sess. 34-37, 53, 95-119, reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 3979-82, 3998, 4039-63 [hereinafter cited as House Report; page references to U.S.Code Cong. & Ad.News are provided in brackets]; H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 79-80, reprinted in 1980 U.S.Code Cong. & Ad.News 4110-11 [hereinafter cited as Conference Report; page references to U.S.Code Cong. & Ad.News are provided in brackets]
 
 
 [5]
 House Report, note 4, at 38, 115-19 [3983, 4059-63]; Conference Report, note 4, at 89 [4120-21]
 
 
 [6]
 See Western Coal Traffic League v. United States, 5 Cir.1983 (en banc), 719 F.2d 772, 777, 778 & n. 10, noting that the Staggers Act was enacted to hasten deregulation
 
 
 [7]
 This form of review over intrastate rates dates from the Supreme Court's 1914 decision in Houston, E. & W.T. Ry. v. United States (Shreveport Rate Case), 1914, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341. In this decision, the Court held that the ICC had implicit authority under the Interstate Commerce Act to establish intrastate rate levels in cases in which intrastate rates, though lawfully established by a state commission, discriminated against interstate commerce. Although at the time the Shreveport Rate Case was decided Congress had not expressly granted the ICC any intrastate rate authority, the Court found that the Commission's authority to adjust intrastate rates was necessary to protect interstate commerce. In the Transportation Act of 1920, ch. 91, Sec. 416, 41 Stat. 456, 484, Congress codified the Shreveport Rate Case holding by amending the Interstate Commerce Act to provide that the ICC may establish an intrastate rate if a state-set rate was found to interfere unreasonably with interstate commerce
 
 
 [8]
 This second mode of review over state rate regulation was added by Sec. 210 of the 4R Act, 90 Stat. at 46
 
 
 [9]
 It was estimated that the disparity between intrastate rates and interstate rates caused interstate rail carriers a total revenue loss of $400,000,000 in 1977. House Report, note 4, at 61 [4006]
 
 
 [10]
 Indianapolis Power & Light Co. v. ICC, 7 Cir.1982, 687 F.2d 1098, 1100; House Report, note 4, at 61, 128-30 [4006, 4072-74]
 
 
 [11]
 "General rate increases" are those that are adopted by a large number of carriers and that apply nationally or throughout broad regions of the country to all or a large number of commodities or services. Indianapolis Power & Light Co. v. ICC, 7 Cir.1982, 687 F.2d 1098, 1100 & n. 2; id. at 1106 (Pell, J., concurring in part and dissenting in part)
 
 
 [12]
 See Louisville & N.R.R. v. Kentucky Utils. Co., W.D.Ky.1982, 535 F.Supp. 244, 247-48
 
 
 [13]
 "This subtitle does not affect the power of a State, in exercising its police power, to require reasonable intrastate transportation by carriers providing transportation subject to the jurisdiction of the Commission under this subchapter unless (1) the transportation is deemed to be subject to the jurisdiction of the Commission pursuant to section 11501(b)(4)(B) of this title, or (2) ...."
 49 U.S.C.A. Sec. 10501(c) (1983) (emphasis added).
 "Any State authority which is denied certification or which does not seek certification may not exercise any jurisdiction over intrastate rates, classifications, rules, and practices until it receives certification under this subsection."
 Id. Sec. 11501(b)(4)(A).
 
 
 [14]
 There is some disagreement among the parties as to the extent to which certified state agencies must follow the policies and decisions of the ICC. The Court of Appeals for the Seventh Circuit has held that "consistent rulings of the ICC must necessarily be incorporated and adhered to by state commissions exercising jurisdiction pursuant to the Staggers Act". Illinois Central Gulf R.R. v. ICC, 7 Cir.1983, 702 F.2d 111, 115
 In ruling on the appellants' facial attack on the constitutionality of the Staggers Act, it is not necessary for this Court to decide this question of statutory construction. For the purpose of analyzing the appellants' tenth amendment argument, we assume without deciding that the Act leaves certified state agencies no significant amount of discretion.
 
 
 [15]
 The appellants argued before the district court that the Act's "market dominance" provisions violate the rights that "captive shippers" possess under the equal protection component of the fifth amendment's due process clause. The appellants do not renew this argument on appeal. Therefore, we do not address it
 
 
 [16]
 All of these arguments, except for the guaranty clause argument, were considered and rejected by the United States District Court for the District of Montana, which upheld the facial constitutionality of the Staggers Act. See Montana ex rel. Montana Dep't of Agriculture v. United States, D.Mont. Sept. 9, 1983 (No. CV-81-29-GF), appeal filed, 9 Cir. Oct. 25, 1983 (No. 83-4246)
 
 
 [17]
 See sources cited in notes 4, 9-10
 
 
 [18]
 Two other courts have reached the same conclusion. See Montana ex rel. Montana Dep't of Agriculture v. United States, D.Mont. Sept. 9, 1983, slip op. at 3-4 (No. CV-81-29-GF), appeal filed, 9 Cir. Oct. 25, 1983 (No. 83-4246); Louisville & N.R.R. v. Kentucky Utils. Co., W.D.Ky.1982, 535 F.Supp. 244, 246
 
 
 [19]
 The only activities that are beyond the reach of Congress are " 'those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government' ". Katzenbach v. McClung, 1964, 379 U.S. 294, 302, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (quoting Gibbons v. Ogden, 1824, 22 U.S. (9 Wheat.) 1, 195, 6 L.Ed. 23)
 20 U.S. Const. art. VI, cl. 2.
 
 
 [21]
 The appellants assert that the courts have used a balancing test to decide whether a statute that preempts state law is a valid exercise of the commerce power. They misread the cases. As support for their argument, the appellants cite California v. Zook, 1949, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005; Peel v. Florida Dep't of Transp., 5 Cir.1979, 600 F.2d 1070; and Scott v. City of Anniston, 5 Cir.1979, 597 F.2d 897, cert. denied, 1980, 446 U.S. 917, 100 S.Ct. 1850, 64 L.Ed.2d 271. In California v. Zook, the Supreme Court weighed the national interest in uniform regulation against the states' interest in independent state regulation to determine whether Congress intended to preempt state law, not whether Congress could preempt state law. See 336 U.S. at 733-38, 69 S.Ct. at 845-48. In both Peel and Scott, the balancing of state and federal interests was part of the Courts' efforts to analyze whether the federal statutes violated the tenth amendment, see Peel, 600 F.2d at 1083; Scott, 597 F.2d at 900; the Courts were not seeking to determine whether the commerce clause empowered Congress to enact the statutes in question
 The validity of a preemptive statute is judged against the same "rational basis"/"reasonable relation" test that applies to other types of action under the commerce power. See FERC v. Mississippi, 1982, 456 U.S. 742, 754, 102 S.Ct. 2126, 2134, 72 L.Ed.2d 532; National League of Cities v. Usery, 1976, 426 U.S. 833, 840, 96 S.Ct. 2465, 2469, 49 L.Ed.2d 245. As the Supreme Court stated 43 years ago, "[t]he power of Congress over interstate commerce ... can neither be enlarged nor diminished by the exercise or non-exercise of state power". United States v. Darby, 1941, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609; see also Hodel v. Virginia Surface Mining & Reclamation Ass'n, 1981, 452 U.S. 264, 290, 101 S.Ct. 2352, 2367, 69 L.Ed.2d 1; Cloverleaf Butter Co. v. Patterson, 1942, 315 U.S. 148, 154, 62 S.Ct. 491, 495, 86 L.Ed. 754.
 
 
 [22]
 The standard analysis derives from Chief Justice Marshall's opinion in McCulloch v. Maryland, 1819, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579; see L. Tribe, American Constitutional Law Sec. 5-3, at 230 (1978). That case, of course, did not involve civil rights legislation
 
 
 [23]
 "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X
 
 
 [24]
 See also The Supreme Court, 1981 Term, 96 Harv.L.Rev. 62 (1982):
 "Acts like [the one at issue in FERC] may bypass constitutional requirements for proper federal lawmaking and expand federal regulatory influence beyond the range contemplated by the Constitution. These types of compromise acts enable Congress to advance federal policy through state institutions when a lack of majority support for substantive national legislation might otherwise prevent federal regulation.... It is questionable that the Constitution empowers Congress to compel state regulation of interstate commerce in precisely those situations in which Congress cannot agree on the virtue of a national regulatory plan."
 Id. at 190-91 (footnote omitted).
 
 
 [25]
 Notably, the presentment clause, U.S. Const. art. I, sec. 7, cls. 2-3, the President's veto power, id., and the Vice-President's position as president of the Senate, id. sec. 3, cl. 4
 
 
 [26]
 See EEOC v. Wyoming, 103 S.Ct. at 1067 (Stevens, J., concurring): "Neither the Tenth Amendment, nor any other provision of the Constitution, affords any support for [National League of Cities ] judicially constructed limitation on the scope of the federal power granted to Congress by the Commerce Clause." (footnotes omitted)
 
 
 [27]
 Professor Black has criticized the courts for relying too often on textual analysis. He suggests that it would often be preferable to infer constitutional rights "from the structures and relationships created by the Constitution in all its parts or in some principal part". C. Black, Structure and Relationship in Constitutional Law 7 (1969). There is a large measure of legal pragmatism in his contention, but its persuasiveness should not lead a court to disregard its obligation to examine the text and the legislative history of constitutional and statutory provisions at issue in a case. Justice Rehnquist's opinion in National League of Cities can be read for the view that the tenth amendment is an "express [textual] declaration" of the limits on the power of Congress to override state sovereignty, but that the limits themselves derive from the "essential [structural] role of the States in our federal system of government", 426 U.S. at 844, 96 S.Ct. at 2470. There is a structural basis for the decision, therefore, that could be at odds with an historical and textual analysis of the tenth amendment
 
 
 [28]
 The Supreme Court has expressed similar concerns and reached similar conclusions in its decisions dealing with the doctrine of intergovernmental tax immunity. See New York v. United States, 1946, 326 U.S. 572, 575, 582, 66 S.Ct. 310, 311, 314, 90 L.Ed. 326 (opinion of Frankfurter, J.); id. at 587-88 (Stone, C.J., concurring); Metcalf v. Mitchell, 1926, 269 U.S. 514, 521, 523, 46 S.Ct. 172, 173, 174, 70 L.Ed. 384. In United States v. California, 1936, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567, the Court expressed the view that the tax immunity decisions were not analogous to situations involving the issue of state-sovereignty constraints on the commerce power. See id. at 184-85, 56 S.Ct. at 424-25. This view was repudiated in National League of Cities. See 426 U.S. at 854-55, 96 S.Ct. at 2475-76
 
 
 [29]
 Of course, such acts do not violate constitutional rights of state sovereignty if the acts are minimally intrusive. To be invalid under the doctrine of National League of Cities, a statute that regulates the states as states must also address matters that are indisputably attributes of state sovereignty, and it must be apparent that the states' compliance with the statute would directly impair their ability to structure integral operations in areas of traditional governmental functions. See, e.g., EEOC v. Wyoming, 103 S.Ct. at 1061
 
 
 [30]
 The appellants argue that, if the only limitation on congressional power to preempt state law is the requirement that the regulated activity substantially affect interstate commerce, then Congress effectively has the power to preempt virtually all of state law. It is possible that widespread abuse of the power to preempt could leave state sovereignty superficially intact but in reality nothing more than a "gutted shell", L. Tribe, American Constitutional Law Sec. 5-20, at 302 (1978). Individual Justices of the Supreme Court, as well as the Court itself, have noted that constitutional problems might arise if Congress attempted to preempt large areas of state law. See Hodel v. Virginia Surface Mining & Reclamation Ass'n, 1981, 452 U.S. 264, 309-13, 101 S.Ct. 2352, 2390-93, 69 L.Ed.2d 1 (Rehnquist, J., concurring in the judgment); Griffin v. Breckenridge, 1971, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338; Perez v. United States, 1971, 402 U.S. 146, 157-58, 91 S.Ct. 1357, 1362-63, 28 L.Ed.2d 686 (Stewart, J., dissenting); NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 30, 37, 57 S.Ct. 615, 621, 624, 81 L.Ed. 893
 We need not address such ominous possibilities in this case. As Justice Frankfurter has noted,
 "The process of Constitutional adjudication does not thrive on conjuring up horrible possibilities that never happen in the real world and devising doctrines sufficiently comprehensive in detail to cover the remotest contingency. Nor need we go beyond what is required for a reasoned disposition of the kind of controversy now before the Court."
 New York v. United States, 1946, 326 U.S. 572, 583, 66 S.Ct. 310, 314, 90 L.Ed. 326.
 
 
 [31]
 Even the Court's staunchest defenders of state sovereignty have acknowledged this principle. See FERC, 456 U.S. at 775 n. 1, 787, 102 S.Ct. at 2146 n. 1, 2152 (O'Connor, J., dissenting); National League of Cities, 426 U.S. at 844-45, 96 S.Ct. at 2470-71 (majority opinion of Rehnquist, J.); Fry v. United States, 1975, 421 U.S. 542, 552, 95 S.Ct. 1972, 1798, 44 L.Ed.2d 363 (Rehnquist, J., dissenting); Bethlehem Steel Co. v. New York State Labor Relations Bd., 1947, 330 U.S. 767, 780, 67 S.Ct. 1026, 1033, 91 L.Ed. 1234 (separate opinion of Frankfurter, J.)
 
 
 [32]
 This result is constitutionally permissible, of course, because of the supremacy clause. Constitutional rights of state sovereignty are not implicated simply because the states cannot prevent the carrying out of federal policy. The Constitution's protection of state sovereignty is concerned with the manner in which the federal government treats the states and with the effect that this treatment has upon the state governments; it is not concerned with the substantive effect of federal law
 
 
 [33]
 Accord Montana ex rel. Montana Dep't of Agriculture v. United States, D.Mont. Sept. 9, 1983, slip op. at 4-5 (No. CV-81-29-GF), appeal filed, 9 Cir. Oct. 25, 1983 (No. 83-4246)
 
 
 [34]
 "The United States shall guarantee to every State in this Union a Republican Form of Government ...." U.S. Const. art. IV, sec. 4
 
 
 [35]
 The appellants did not raise this argument before the district court. As a general rule, we will not consider an issue raised for the first time on appeal. United States v. Parker, 5 Cir.1983, 722 F.2d 179, 183 n. 2; Hudspeth v. United States, 5 Cir.1975, 519 F.2d 1055, 1056 n. 1. The decision whether to apply the general rule is, however, within our discretion, and it is a matter to be determined on a case-by-case basis. Singleton v. Wulff, 1976, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826. It may be appropriate to address the issue if it concerns a pure question of law, see, e.g., In re Johnson, 5 Cir.1984, 724 F.2d 1138, 1140, or if the proper resolution of the issue is beyond doubt, see Singleton v. Wulff, 428 U.S. at 121, 96 S.Ct. at 2877. Both of these conditions are present with regard to the appellants' guaranty clause argument. We therefore see no reason not to address the argument
 
 
 [36]
 In Montana ex rel. Montana Dep't of Agriculture v. United States, D.Mont. Sept. 9, 1983 (No. CV-81-29-GF), appeal filed, 9 Cir. Oct. 25, 1983 (No. 83-4246), the district court considered a "taking" argument directed against the Staggers Act in a facial attack. Using reasoning similar to that in the text, the court held that the argument was not ripe. Id., slip op. at 5